MEADOWS, WYE & CO. (INC.) ET AL. *v.* UNITED STATES (No. 3148) [1]

---

[1] T. D. 43324.

United States Court of Customs and Patent Appeals, April 2, 1929

*Brooks & Brooks* (*Frederick W. Brooks, jr.*, of counsel) for appellants.
*Charles D. Lawrence*, Assistant Attorney General (*Philip Stein* and *Oscar Igstaedter*, special attorneys, of counsel), for the United States.

[Oral argument January 29, 1929, by Mr. Brooks and Mr. Igstaedter]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court in reappraisements numbers 63693–A, 64311–A, 64315–A, 64367–A, 64805–A, 64890–A, 64894–A, 65011–A, 65129–A, 65130–A, 65413–A, 65416–A, 66218–A, 66222–A, 66286–A, 66313–A, 66388–A, 66402–A, 66403–A, 68359–A, 68360–A, 68383–A, 68740–A, 68900–A, 69277–A, 69278–A, 69363–A, 69392–A, 69444–A, 69445–A, 69873–A, 70088–A, 70221–A, 70432–A, 70438–A, 70439–A, 70441–A, 70442–A,

70689–A, 70976–A, 71361–A, 71532–A, 71988–A, 72222–A, 73078–A, 73081–A, and 73085–A.

Reappraisement No. 63693–A is the original case and involves a "voluntary" entry; the other cases involve "duress" entries.

The merchandise consists of flannels known as "Viyella," "Clydella," and "Ramada." It was entered at the invoice prices and appraised at prices at which it was sold in the country of production— the British Isles. The appraised values were higher than the entered values in the original case No. 63693–A.

Importers appealed to reappraisement.

Considerable evidence was introduced on the trial before the associate justice sitting in reappraisement.

It appears from the record that the merchandise is manufactured by William Hollins & Co. (Ltd.), Glasgow, Scotland; that all sales are handled by William Hollins & Co. (Ltd.), of London, England; and that it is sold only to firms or individuals who sign written contracts obligating themselves not to resell the flannels, or garments made therefrom, at prices less than those fixed by William Hollins & Co. (Ltd.) and set out in the contract of purchase and sale. The agreement referred to is substantially as follows:

* * * The above goods (*goods invoiced*) are sold on the conditions that the same shall not be retailed or otherwise sold below the lowest recognized selling prices ruling at the time; that the terms and conditions indorsed hereon are observed; and that by accepting this invoice and the goods comprised therein you, the purchaser, assent to the foregoing conditions and contract with us William Hollins & Co. (Ltd.) to observe the same.

No "Viyella," "Aza," or "Clydella" cloth shall be sold at less than the above prices (*prices quoted on back of invoice*) at any time; "Sales" included.

No garment made from these cloths shall be retailed or otherwise sold at less than the above prices (*garments prices quoted on back of invoice*) whether the garments are bought from William Hollins & Co. (Ltd.) or made up from these cloths elsewhere, excepting from January 1 to February 7, and from July 1 to August 7, respectively.

Any "Viyella," "Aza," or "Clydella" goods not enumerated above shall not be retailed at a price less than 30 per cent profit on returns.

The above-quoted statement appears on all invoices for the merchandise in question.

It further appears from the record that William Hollins & Co. (Inc.), of New York, is owned and controlled by William Hollins & Co. (Ltd.), of Great Britain; and that the involved merchandise is sold for export to the United States to one purchaser only—William Hollins & Co. (Inc.).

Witnesses for importers and for the Government stated that, as William Hollins & Co. (Ltd.) desire to control the prices at which they shall be sold, "Viyella," "Clydella," and "Ramada" flannels are not freely offered for sale to all purchasers in the British Isles. It

further appears from the testimony that the selling prices to the retailer and the resale prices at which the retailer may sell are the same regardless of the quantity purchased; that William Hollins & Co. (Ltd.) manufacture merchandise similar to that involved, and that it is freely offered for sale in the usual wholesale quantities and in the ordinary course of trade to all purchasers in the principal markets of Great Britain. However, these flannels are not permitted to be sold under the names of "Viyella," "Clydella," or "Ramada."

With reference to the policy of William Hollins & Co. (Ltd.) the witness, Marcus L. T. Hare, said:

> The reason that we have refused to sell wholesalers and will not sell them is that it is difficult to control their resales and it has been our policy for many years to strictly control not only the price at which we sell our Viyella, Clydella, and Aza flannels, but also to control the price at which they may be resold, and the price at which garments made from these cloths shall be sold, and we have not only refused to sell to those who would not agree to these conditions but we have also taken legal action to enforce the carrying out of these agreements wherever we have learned of any noncompliance by any one to whom we have sold these cloths.

With reference to the ordinary course of trade in textile fabrics in the British Isles, the same witness said:

> The ordinary course of trade in textile fabrics in the British Isles is to freely offer for sale and sell to all purchasers in the principal markets, who will take reasonable wholesale quantities and it is usually customary to fix a lower price for the wholesalers than the price fixed for the retailers as the former expect to sell the latter at a profit.

It was conceded by counsel for the parties in each of the courts below, and it is conceded here, that the merchandise had no export values.

There is some evidence in the record to the effect that the merchandise is not freely offered for sale in the principal markets of the United States to all purchasers in the usual wholesale quantities and in the ordinary course of trade. We are unable to find any evidence, however, that similar or comparable merchandise is not so offered and sold in the United States. The record contains evidence of the cost of production.

The trial court held that the merchandise had no foreign values, but that it had export values, and that they were the same as the invoice and entered values. From the judgment entered upon these findings, the Government appealed to the appellate division of the United States Customs Court.

The appellate division, in an opinion by Waite, Justice, held that the limited and restricted sales of the involved merchandise by William Hollins & Co. (Ltd.) did not result in a restricted market; that the prices at which such merchandise was sold in the British Isles for home consumption were its foreign values; and that these values were the same as the appraised values. Accordingly, the judgment of the

trial court was reversed. From the judgment entered upon these findings, importers have appealed to this court.

It is claimed by counsel for importers that the merchandise has no foreign values. This argument is based upon the proposition that the merchandise is not freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade in the principal markets of the British Isles for home consumption. It is contended that the record shows that there are no United States values, and that the dutiable value is the cost of production.

Counsel for the Government, however, contend that the merchandise is freely offered for sale to all purchasers in the principal markets of the British Isles, in the usual wholesale quantities and in the ordinary course of trade; that there is evidence of foreign values; and that there is substantial evidence in the record to sustain the findings of the court below.

The pertinent parts of section 402 read as follows:

SEC. 402. VALUE.—(a) For the purposes of this Act the value of imported merchandise shall be:

(1) The foreign value or the export value, whichever is higher;

(2) If neither the foreign value nor the export value can be ascertained to the satisfaction of the appraising officers, then the United States value;

(3) If neither the foreign value, the export value, nor the United States value can be ascertained to the satisfaction of the appraising officers, then the cost of production;

\*      \*      \*      \*      \*      \*      \*

(b) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*      \*      \*      \*      \*      \*      \*

(d) The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

In the case of *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158, this court had under consideration an issue identical in principle with that here involved. There it was established that the distribution, sale, and the prices at which

certain automobile tires were sold in Canada were controlled by the manufacturer from the time they left the factory until they reached the ultimate consumer. Summing up the statement of the facts in that case the court said: "In brief, the selected dealer and the selected jobber buy and sell the Goodyear product at a fixed price, and if either sells for a price other than that fixed he loses his agency."

In that case it appeared that the exact resale price was fixed by the manufacturer. In the case at bar it appears that the resale price of the involved flannels shall not be less than a price fixed by the manufacturer. There the manufacturer sold to a limited number of jobbers and dealers, and to those only who would agree to sell at the prices fixed by the manufacturer. Here the manufacturer restricts the market to those who will agree to sell at not less than a minimum price fixed by the manufacturer. In that case, as in the case at bar, the price of the merchandise was the same regardless of the quantity purchased.

In the *Goodyear Tire & Rubber Co.* case we held that where the manufacturer controlled the market for his merchandise in the country of exportation and fixed the prices at which it was sold from the time it left the factory until it reached the consumer, and limited the sales to those who would abide by the orders and instructions of the manufacturer as to the resale prices, the market was restricted, and that the merchandise was not freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade, as provided by paragraph R of the Tariff Act of 1913.

Again, in the case of *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216, the question of a restricted market was before this court. Several cases upon the subject were reviewed. The merchandise consisted of brass jardinières and electric brackets. It was sold in the markets of Great Britain and Ireland to wholesalers at certain list prices with discounts of 10 per centum and 2½ per centum. All other purchasers, however, were required to pay the list prices, with discounts of only 2½ per centum. The prices were the same, regardless of the quantity purchased. The United States Customs Court held that the list prices less 10 per centum and 2½ per centum were the foreign values of the merchandise. We there said:

We are unable to see, under the facts hereinbefore stated, where any such evidence appears in the record. The exporters are selling a minor portion of their product at the price claimed by the importer here, namely, list price less 10 per cent and 2½ per cent. How may this properly be claimed to be the *ordinary* course of trade? Even if it be conceded that the *ordinary course of trade* may be determined by the usage in a minor fraction thereof, it certainly can not be said that merchandise is being *freely offered for sale* when it is offered to certain purchasers only, and these purchasers, ones who have "*satisfied*" the seller that they are wholesalers only.

    *       *       *       *       *       *       *

It is argued because sales to wholesalers are all made at the same price that therefore this price thus becomes the wholesale price. But it will be observed that the statute does not thus establish the wholesale price. Section 402 (b) does not provide that the wholesale price shall be the price to *wholesalers*, but the price in the usual *wholesale quantities*. The law is not concerned with the persons who buy, but the manner in which they buy.

In view of the fact that the manufacturer restricts the market for the involved merchandise to those firms and individuals who will agree to resell at prices not less than those fixed by the manufacturer, and, as the manufacturer's prices are the same regardless of the quantity purchased, we are of opinion that the merchandise is not freely offered for sale to all purchasers in the principal markets of Great Britain, in the usual wholesale quantities and in the ordinary course of trade, and that the issue is controlled by our decision in the *Goodyear Tire & Rubber Co.*, and the *Richard & Co.* cases, *supra*. We so hold.

In the finding of foreign, export, and United States values the Congress in section 402, *supra*, has used in each definition the following language: " * * * at which *such* or *similar* [the word "imported" appears in the definition of the United States value] merchandise is freely offered for sale * * *." (Italics ours.) The words "such" and "similar" were not intended to be used synonymously, but alternatively. *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714. This being so, it is evident that, in order to negative the existence of a foreign, export, or United States value, it is not sufficient to establish that "such" (the involved) merchandise was not freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade.

Counsel in this case, as in many, seem to be laboring under the erroneous impression that the real issue before the trial court is: Are the values returned by the appraiser the proper dutiable values of the merchandise? That is not the issue in reappraisement cases. We have many times held that the trial by an associate justice of an appeal to reappraisement is *de novo*, and that no presumption of correctness attends the decision of the appraiser. See *Happel & McAvoy (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 161, T. D. 42791, and cases cited. Accordingly, it is incumbent upon the party who perfected the appeal to meet every material issue involved in the case. If he fails to do so, his appeal is subject to dismissal by the trial court, in which event the appraised value would be in full force and effect. *United States* v. *F. B. Vandegrift & Co. et al.*, 16 Ct. Cust. Appls. 278, T. D. 43120.

In order to prove that the involved merchandise has no foreign values as claimed, it was incumbent upon the importers to establish that neither "such" (the involved) nor "similar" merchandise was freely offered for sale to all purchasers in the principal markets of the British Isles, in the usual wholesale quantities and in the ordinary

course of trade. *United States* v. *F. Vietor & Achelis*, 16 Ct. Cust. Appls. 122, T. D. 42767.

It is claimed by counsel for appellants that it has been established that merchandise similar to that involved was not freely offered for sale in the principal markets of the British Isles in the usual wholesale quantities and in the ordinary course of trade. In support of this claim, our attention has been directed to Exhibit No. 10, a report of Customs Attaché C. B. Wait. We quote:

* * * He [Mr. Hare, managing director of William Hollins & Co. (Ltd.)] said that the flannels manufactured by his firm were in a class by themselves and that it would be almost impossible to find comparable merchandise in Great Britain; * * *.

The statement that the flannels manufactured by William Hollins & Co. (Ltd.) were in a class by themselves, and that it would be almost impossible to find comparable merchandise in Great Britain, is not sufficient to establish that similar merchandise was not freely offered for sale in the British Isles. Furthermore, it appears from the testimony of the importers' witnesses, David H. Ferguson, in Exhibit No. 3, W. M. Evans, in Exhibit No. 4, James Allan, in Exhibit No. 5, Fred. W. Buck, in Exhibit No. 6, John Sugden Smith, in Exhibit No. 7, and Charles Warren, that merchandise similar and comparable to that involved is freely offered for sale and sold to all purchasers in the principal markets of the British Isles, in the usual wholesale quantities and in the ordinary course of trade. However, these witnesses failed to state the prices or market values of such similar and comparable merchandise.

In this connection, and with reference to similar merchandise, the assistant customs attaché, Norman Kane, in Exhibit No. 15, said that his office had intended to make an extensive survey to ascertain if merchandise similar to that involved was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade for consumption in the British Isles; that such an investigation had been started, but that, due to notice from the "department" that importers had agreed to accept the values returned by the appraiser (this probably has reference to entries made prior to those involved), it was discontinued. He further said, however, that while information in his possession on the date of the report was meager and inconclusive, it might prove of some slight value. The report, Exhibit No. 15, continues:

* * * During the time at which the investigation was being pushed we had not secured any definite information from any manufacturer as to any cloth closely approximating the ones in question. The two firms revisited have provided us with samples of their cloths and an estimate of the value of the two samples of "Clydella" and "Viyella." The information secured from R. R. Buck & Sons is submitted in this present report. The results obtained from the other firm are in a separate report accompanying this one.

I interviewed Mr. Fred W. Buck, one of the members of the firm of Robert R. Buck & Sons, of Carlisle, England. I had previously submitted to Mr. Buck samples of Exhibits A and B with a request for information on values and sales of the cloths made by his company most nearly comparable with these exhibits. Attached, as Exhibit X, is a sample of cloth handed to me by Mr. Buck with a statement that of the cloths they manufacture it is the nearest approximation to the cloth covered by our Exhibit A. [Clydella.] He stated that he estimated that his firm could make up the cloth of Exhibit X at a cost of 20½d. per yard in the 31-inch width and that they would sell it in the usual wholesale quantities for approximately 23d. per yard. Mr. Buck handed me the cloth covered by Exhibit Y and stated that this cloth in the cream color was the nearest they had to Exhibit B. [Viyella.] He explained that he did not at that time have available any of the cloth in the cream color but that the striped pattern was exactly the same cloth, and each would cost 23⅝d. per yard to make in the 32-inch width and that they would sell it at approximately 26d. per yard. These prices are subject to usual cash discounts allowed by this company, namely, 2½ per centum for cash within 60 days or 3¾ per centum for cash on receipt of invoice.

For the purpose of clarity, we requote the following: "Attached, as Exhibit X, is a sample of cloth handed to me by Mr. Buck with a statement that of the cloths they manufacture it is the *nearest approximation* to the cloth covered by our Exhibit A. [Clydella.] * * * Mr. Buck handed me the cloth covered by Exhibit Y and stated that this cloth in the cream color was the *nearest they had* to Exhibit B. [Viyella.]" (Italics ours.) Obviously, this is not evidence that the kinds of cloth represented by Exhibits X and Y are comparable or similar to the involved merchandise. The words "similar merchandise" do not mean "the nearest approximation" of, or "the nearest they had to," the imported merchandise; they involve, among other things, similarity of material and use, and commercial interchangeability. *United States* v. *Irving Massin & Bros., supra.*

With regard to this testimony, counsel for importers make two inconsistent contentions, namely: First, that it proves that similar merchandise is freely offered for sale to all purchasers in Great Britain at prices less than the entered values of the involved merchandise; second, that it proves that there is no "similar" merchandise.

We agree, as hereinbefore pointed out, that the statement contained in Exhibit No. 15 does not prove that the merchandise therein referred to is similar to that involved. Accordingly, evidence of the market values of such merchandise is irrelevant and immaterial. While the testimony is somewhat general, we are of opinion that the existence of similar merchandise has been established. It may be that it was sold at prices less than the entered values of the merchandise in question. However, there is no evidence of the market values of such similar merchandise. It is evident, therefore, that importers have failed to negative the existence of foreign values. This being so, it was the duty of the trial court either to dismiss the appeal or to direct that evidence of the values of similar merchandise be intro-

duced. However, as counsel on both sides seem to have overlooked this phase of the case, we think that a new trial should be granted. We are of opinion, therefore, that there is no substantial evidence to sustain the findings of the appellate court.

For the reasons stated the judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.