GOODYEAR TIRE & RUBBER CO. *v.* UNITED STATES (NO. 2146).[1]

1. "ORDINARY COURSE OF TRADE"—"WHOLESALE QUANTITIES"—RESTRICTED MARKET.

When the manufacturer of imported merchandise controls its market in the country of its exportation, so that its price is fixed to each class of purchaser (manufacturer, jobber, retailer, and consumer) and this price is the same regardless of the size of any purchase, there is, in that country, no "actual market value" "in the usual wholesale quantities" "in the ordinary course of trade" within the meaning of any of those expressions in paragraphs K and R, tariff act of 1913. Such fixed prices were not intended by Congress to be a factor in determining dutiable values.

2. APPRAISEMENT ON WRONG PRINCIPLE OF LAW.

An appraisement based on a wrong principle of law is void.

3. APPRAISEMENT IN CONTROLLED MARKET.

Regarding an importation from Canada of automobile tires, it is shown that the manufacturer controls the Canadian market for his tire, the price being fixed regardless of the size of the sale to each class of purchaser—automobile manufacturer, tire jobber, tire retailer, and tire consumer. There can be no "actual market value" or "usual wholesale quantities," or "ordinary course of trade" determined upon the basis of such prices within the meaning of any of the quoted expressions in paragraphs K and R, tariff act of 1913. The decision of the Board of General Appraisers fixing the dutiable value at the Canadian price to dealers and service stations proceeded upon a wrong principle of law, is hence void, and is reversed. Appraisement should have been made as prescribed by paragraph L, Section III, either at the cost of production or at the wholesale price for which such or similar merchandise was freely offered for sale in the usual wholesale quantities in the open market in the United States.

United States Court of Customs Appeals, June 6, 1922.

APPEAL from Board of United States General Appraisers, G. A. 8477 (T. D. 38906).

[Reversed.]

*B. A. Levett* (*James W. Bevans* of counsel) for appellant.

*William W. Hoppin*, Assistant Attorney General, (*Samuel Isenschmid*, special attorney, of counsel), for the United States.

---

[1] T. D. 39158

[Oral argument April 26, 1922, by Mr. Levett and Mr. Isenschmid.]

Before SMITH, BARBER, and MARTIN, Associate Judges; DE VRIES, Presiding Judge, participating in the decision by agreement of counsel.

Smith, Judge, delivered the opinion of the court:

This appeal raises the question as to the validity of the appraisement of automobile tires imported from Canada. The tires were purchased by the Goodyear Tire & Rubber Co., of Akron, Ohio, from the Goodyear Tire & Rubber Co., of Toronto, a corporation wholly independent of the importer, although having the same name and president. The tires are manufactured in Canada and their distribution, sale, and the prices at which sold in Canada are absolutely under the control and controlled by the manufacturer from the time they leave the factory until they reach the hands of the ultimate consumer. The tires are distributed by 13 or 14 agencies of the Goodyear Co. and by a limited number of jobbers and dealers whose operations are restricted to districts selected and defined by the corporation. The corporation sells to exporters, to manufacturers of automobiles, to jobbers, and to dealers at a price graded and definitely fixed for each of the four classes of buyers. The prices at which jobbers may sell to dealers or service stations, and dealers and service stations may sell to consumers, are likewise fixed by the corporation. The exporter has the privilege of buying at the lowest price, and anyone may buy tires for exportation provided he agrees to ship them out of Canada.

The manufacturer of automobiles is favored with a lower price than that prescribed for the jobber or dealer, but the tires purchased by him can not be sold except as part of the manufactured car. Jobbers, five in number, chosen by the corporation and operating within areas specified by the company may purchase the product at a somewhat higher price than that quoted to automobile manufacturers, but they can sell for their own account to no one except dealers within their district and then only at the price prescribed by the corporation. If the jobber retails a tire he must do so at the retailer's price and then pay the dealer's price to the manufacturer for the tire so retailed; that is to say, 10 per cent more than is charged to him as jobber, which 10 per cent is paid by the manufacturer to the dealer in whose territory the retail sale is made.

The dealers, *limited in number*, are selected by the corporation and are not permitted to operate outside of the district to which they have been assigned by the company. The dealer pays the highest price and the price at which he sells to the consumer is fixed by the manufacturer. Of the tires sold by the corporation in Canada, 45.06 per cent are sold to manufacturers of automobiles, 9.12 per cent are sold to jobbers and 45.82 per cent are sold to dealers. As the jobbers must sell to the selected dealers of their respective dis-

tricts the dealers purchase for retail 54.94 per cent of the tires consumed in Canada.

The general manager of the Toronto company frankly testified that there were hundreds and perhaps thousands of dealers who were refused the privilege of purchasing and selling Goodyear tires. He said that no one not a selected jobber or dealer could come to the manufacturer and buy tires *freely* for resale in Canada, and that the corporation reserved the right to withdraw from the manufacturers of automobiles and selected jobbers and dealers the privilege of buying and selling Goodyear tires in case conditions imposed by the company were not complied with. In brief, the selected dealer and the selected jobber buy and sell the Goodyear product at a fixed price and if either sells for a price other than that fixed he loses his agency.

Tire dealers in foreign countries are not restricted in number and they may sell tires in foreign countries at any price they please. Whether tires are bought in large or small quantities does not affect the sales price to jobbers, dealers, service stations or manufacturers of automobiles.

The local appraiser appraised the importation at the price paid for tires by dealers and service stations in Canada. From this appraisement an appeal was taken to a general appraiser who approved the action of the local appraiser, and the decision of the general appraiser was affirmed on appeal by a board of three general appraisers. The importer challenged the validity of the final appraisement on the ground that it was based upon a wrong principle of law. The appraisement, however, of the three general appraisers was sustained by the classification board, General Appraiser Fischer dissenting.

The importer petitioned this court to review the decision of the classification board and now contends that on the admitted facts disclosed by the record, the appraised value of the merchandise was not the actual market value as defined by paragraph R of Section III inasmuch as such appraised value was not the price at which such merchandise was freely offered for sale in the usual wholesale quantities to all purchasers in the principal markets of Canada.

The Government, on the other hand, argues that Goodyear tires are sold in Canada in the usual wholesale quantities to dealers who sell them for consumption, and that as such sales to dealers are made "in the ordinary course of trade," established for the particular kind of merchandise here involved, the price paid by such dealers for the tires is their actual market value. In support of that contention the Government earnestly insists that if a manufacturer succeeds in controlling the market and sale at wholesale of his merchandise

in such a way that it can not be bought in any other manner, that then the method so established becomes the usual method in which such merchandise is sold at wholesale in the ordinary course of trade.

It may be that a manufacturer's control of sales and distribution from the time they leave his factory until they reach the ultimate consumer is the "ordinary course of trade" for the marketing of *his* merchandise, but we are not prepared to admit that it is the ordinary course of trade for supplying consumers with tires or other goods. In other words, price-fixing and restriction of distributing agencies may be the ordinary course of trade in Canada for the furnishing of *Goodyear* tires to the public, but it can hardly be said that it is the ordinary course of trade for the marketing of automobile tires or for the marketing of merchandise in general.

As pointed out by the Government, there is a tendency, especially among manufacturers of patented articles, to "thwart the normal effects of competition" by retaining complete control of the sales and distribution of their product until it reaches the hands of the consumer. But it can not be safely contended that that is "the ordinary course of trade" and much less that Congress recognized such marketing as a standard for determining values for tariff purposes. Far from indicating approval of such a course of trade, we think that the radical difference between the original and the present statutory definition of market value, as well as legislation permitting in certain contingencies the liquidation of duties on cost of production, or even on wholesale prices in the open market in the United States, demonstrates that Congress intended that prices fixed by a manufacturer in a market restricted and absolutely controlled by him should *not* be a factor in determining the dutiable value of merchandise. Section 19 of the act of June 10, 1890, provided that whenever goods are—.

subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price of such merchandise as bought and sold in usual wholesale quantities, at the time of exportation to the United States, in the principal markets of the country from whence imported, and in the condition in which such merchandise is there bought and sold for exportation to the United States or consigned to the United States for sale.

When the actual market value as defined in section 19 could not be ascertained to the satisfaction of appraising officers, section 11 of that act forbade the appraisement of merchandise at less than the cost of production, which was defined as follows:

such cost of production to include cost of materials and of fabrication, all general expenses covering each and every outlay of whatsoever nature incident to such production, together with the expense of preparing and putting up such merchandise ready for shipment, and an addition of eight per cent upon the total cost as thus ascertained.

Section 11 was amended by section 32 of the tariff act of July 24, 1897, so as to permit appraising officers to add to the cost of production from 8 to 50 per cent to make appraised value. As an additional protection to the revenue, section 11 as amended allowed appraising officers to take into consideration in determining the dutiable value of merchandise the *wholesale*—

price at which such or similar merchandise is sold or offered for sale in the United States, due allowance being made for estimated duties thereon, the cost of transportation, insurance, and other necessary expenses from the place of shipment to the United States, and a reasonable commission, if any has been paid, not exceeding six per centum.

Notwithstanding all these safeguards, however, Congress found it necessary in sections 18 and 11 of the tariff act of 1909 to redefine market value and to further amend section 11 of the act of 1890. Section 18 provided—

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

SEC. 18. That when imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price thereof at the time of exportation to the United States in the principal markets of the country from whence exported; that such actual market value shall be held to be the price at which such merchandise is *freely offered for sale to all purchasers in said markets, in the usual wholesale quantities*, and the price which the seller, shipper, or owner would have received and was willing to receive for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities. (Italics are ours.)

Section 11 made it the duty of appraising officers to determine the cost of production when market value as defined by law could not be ascertained to their satisfaction and required that the merchandise should not be appraised at less than the total cost of production.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

SEC. 11. Such cost of production to include the cost of materials and of fabrication, and all general expenses to be *estimated at not less than ten per centum*, covering each and every outlay of whatsoever nature incident to such production, together with the expense of preparing and putting up such merchandise ready for shipment, and an addition of not less than eight nor more than fifty per centum upon the total cost as thus ascertained. (Italics are ours.)

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Section 11 further provided—

that the actual market value or wholesale price, as defined by law, of any imported merchandise which is consigned for sale in the United States, or which is sold for exportation to the United States, and *which is not actually sold or freely offered for sale* in usual wholesale quantities in the open market of the country of exportation *to all purchasers*, shall not in any case be appraised at less than the wholesale price at which such or similar imported merchandise is actually sold *or freely offered for sale in usual wholesale quantities in the United States in the open market*, due allowance by deduction being made for estimated duties thereon, cost of transportation, insurance, and other necessary expenses from the place of shipment to the place of delivery, and a commission not exceeding six per centum, *if any has been paid or contracted to be paid on consigned goods, or a reasonable allowance for general expenses and profits (not to exceed eight per centum) on purchased goods.* (Italics are ours.)

Sections 11 and 18 are substantially reenacted as paragraph R and paragraph L of section 3 of the act of 1913, with the exception that from the wholesale price or market value in the United States a deduction of *8 per cent for profits and a reasonable allowance for general expenses, not to exceed 8 per cent on purchased goods, is allowed.*

Stripped of all trimmings, the position of the Government reduces itself to the bald proposition *that sales at wholesale* made to retailers by a manufacturer who effectively determines who shall buy his goods and dictates the price for which they shall be resold at wholesale and retail are nevertheless sales in the ordinary course of trade and that the wholesale price exacted by such a manufacturer is the actual market value of the merchandise.

If that position be sound, then, as General Appraiser Fischer aptly puts it in his dissenting opinion, there is no reason "why the manufacturing company may not reduce the number of its chosen representatives to one agent or dealer and still maintain that it conducts an open market and that its tires are 'freely offered for sale to all purchasers * * * in the usual wholesale quantities,' within the meaning of the law." Indeed, if prices fixed by the manufacturer in markets restricted and absolutely controlled by him constitutes market value within the intention of paragraph R, Section III, then the phrase "freely offered for sale to all purchasers" becomes utterly meaningless. More than that, if fixed prices in such a restricted market be actual market value, then the manufacturer who fixes prices and controls the market has the power to make a market value to his liking and thereby determine in some measure the duties to be paid on his product—a power which might well be exercised not to protect jobbers, dealers, and consumers, as in this case, but to reduce duties on goods manufactured largely or wholly for foreign consumption.

Whatever may be the modern tendency "to thwart competition" we do not consider that it has yet become the *ordinary* course of trade to restrict *all* distributing agencies and control *all* prices until goods have finally reached the hands of the consumer. If such a method of selling and distributing merchandise be the ordinary course of business, it certainly can not be said that merchandise so controlled and distributed is *freely* offered for sale to *all purchasers* in the usual wholesale quantities in the principal markets of the country of exportation. To hold otherwise would do violence to the language of the statute and would not only defeat the manifest purpose of Congress that duties should not be determined by factory fixed prices in a factory controlled market, but would render futile the elaborate legislative measures provided for the protection of the customs revenues.

We hold, first, that in Canadian markets there was according to the record in this case no price at which Goodyear tires were at the time of exportation freely offered for sale in the usual wholesale quantities to all purchasers, and that therefore in the country of exportation such tires had no actual market value within the meaning of that term as defined by law; second, that as the goods had no actual market value in Canada at the time of exportation they should have been appraised as prescribed in paragraph L of Section III either at the cost of production or at the wholesale price for which such or similar merchandise was actually sold or freely offered for sale in the usual wholesale quantities in the open market in the United States; third, that, inasmuch as the appraisement was made on a wrong principle and not as prescribed by law, it is void.

The decision of the Board of General Appraisers is *reversed.*