For the reasons stated herein, we hold that the briquets here involved were not subject to the tax imposed by said section 601 (c) (5) of the Revenue Act of 1932, but should have been admitted free of duty under paragraph 1650 of the Tariff Act of 1930.

The judgment of the United States Customs Court is *reversed* to the extent that it overruled appellant's protest insofar as it related to the briquets here involved, and the cause is *remanded* for further proceedings consistent with the views herein expressed.

UNITED STATES *v.* MICHELE DIAGONALE (No. 3804)[1]

[1] T. D. 47497.

United States Court of Customs and Patent Appeals, January 7, 1935

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *John F. Kavanagh,* special attorney, of counsel), for the United States.

*Siegel & Mandell* (*Samuel T. Siegel* of counsel) for appellee.

[Oral argument October 11, 1934, by Mr. Lawrence and Mr. Siegel]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal by the United States in a reappraisement proceeding wherein the United States Customs Court (First Division) rendered a judgment reversing the judgment of the trial court and adjudging that the foreign value of certain silver filigree was 0.60 lira per gram, plus 2½ per centum sales tax, plus packing.

The merchandise involved was imported from Italy by appellee at the port of New York in 1931. It was appraised by the local appraiser at its entered value, viz, 0.70 Italian lira per gram, plus 2½ per centum sales tax, plus packing. From such appraisement the collector appealed for reappraisement.

Upon the first hearing the single judge dismissed the appeal upon the ground that the Government had failed to make out a *prima facie* case. Upon motion of the Government a rehearing was granted and the case was again submitted upon the record made at the first hearing. The single judge then rendered judgment adjudging that the foreign value of the merchandise was 0.93 lira per gram, plus 2½ per centum sales tax, plus packing.

The importer, appellee here, petitioned for a review of said judgment by the appellate division which, as hereinbefore noted, reversed the judgment of the trial court and entered judgment as aforesaid. From such judgment the United States took this appeal.

The only evidence in the record consists of a report signed by S. Brumer, United States Treasury attaché at Milan, Italy, introduced by the Government, and two affidavits introduced by appellee.

The said report introduced by the Government states that Genoa is the principal market for filigree silver made in Italy and that it is manufactured exclusively in the district surrounding Genoa. The report further states as follows:

An association exists, known as the Federazione delle Artigiane, in Genoa, to which all dealers without exception belong. The association has been in existence over three years, fixes prices which are effective up to and including date of the present investigation. Any infraction to the price rules is punishable by severe fines. All filigree silver is sold by weight in units of grams.

The report further shows that the association price of filigree silver such as is here involved was 0.93 lira per gram, and that at such price said filigree silver was freely offered for sale in Genoa, both for the home market and for export, in the usual wholesale quantities. The report further sets out a number of sales by one firm in Genoa at the uniform price of 0.93 lira per gram for filigree such as is here involved, and the report states that such sales "are representative of the usual wholesale quantities (1) United States and (2) Italy."

520

The report further states:

* * * In the home market the cities of Florence and Venice are the principal purchasers, where the merchandise is sold without further manufacture and in some cases stones are set therein to form bracelets, necklaces, and broaches.

The report shows eleven sales in Genoa by one firm. In only one of these sales was the address of the purchaser given as Genoa. The other ten sales were to purchasers whose addresses were given as Rome, Venice, Florence, and Santa Fe, in Italy, and Chicago and New York in the United States. There is nothing in the record indicating that there was any restriction upon these purchasers as to resale or use of the filigree silver.

The affidavits introduced by appellee consist of an affidavit by the exporter of the involved merchandise, one Giovanni Diagonale, a brother of appellee, and an affidavit by one Bongera Domenico fu Matteo, of Campo Ligure, Italy. (The special agent's report states that Campo Ligure is "several score kilometers distant" from Genoa.) The affidavit of the exporter states that he is a resident of Torre del Greco in Italy, and that he purchased the silver filigree here involved from the firm of Bongera & Piombo, of Campo Ligure, at the price of 0.60 lira per gram.

The material part of the other affidavit is as follows:

I am a member of the firm of Bongera & Piombo, of Campo Ligure; I am personally familiar with the buying and selling transactions of certain silver filigree which occurred between my firm and Mr. Giovanni Diagonale of Torre del Greco. My firm manufactures and sells silver filigree goods, and my firm sells the said filigree in the usual wholesale quantities both in Italy and for export to foreign countries. On October 5th, 1931, my firm sold to Mr. Giovanni Diagonale of Torre del Greco 2,600 grams of silver filigree, of a fineness of 600 per thousand, at lire 0.60 per gram, and that the said price represents the true value of the said merchandise and of similar merchandise sold to others by my firm at that period. And my firm was ready to sell, and willingly would have sold, in the usual wholesale quantities, similar silver filigree at the same price at which it was sold to Mr. Giovanni Diagonale, namely: 60 centimes per gram, as above said. Moreover, my firm sold some silver filigree, of a fineness of 600 per thousand identical to that sold to Mr. Giovanni Diagonale, as above, to Mr. Giovanni Cola, Via San Marco 27, Venice, under date of September 23d, 1931, at the price of 62 centimes per gram; and to Mr. Davide Perugia, Galleria Mazzini, Genoa, under date of November 10th, 1931, at the price of 60 centimes per gram. My firm practices the same price, for the usual wholesale quantities, both for goods sold for local consumption and for goods exported to the United States of America, or to other foreign countries, and it does not practice different prices.

The first question before us is whether the *per se* value of the silver filigree here involved should be determined from the market price of such silver filigree in Genoa or its market price in Campo Ligure.

The appellee here has contended throughout this proceeding that the market in Genoa was a controlled market by reason of the prices of filigree silver being fixed by an association of dealers, with penalties for infractions of such prices, and that therefore the prices so fixed

should not be considered in determining the foreign value of the merchandise involved.

The Government, on the other hand, has contended throughout this proceeding that the mere fixing of prices of filigree silver sold in Genoa, without any restriction as to resale or disposition of the merchandise by the purchaser, does not constitute a controlled market in the sense that the prices so fixed may not be considered in arriving at foreign value.

This is the principal question before us, and it will be first considered.

It is conceded that a foreign value of the merchandise involved existed at the date of its exportation, and therefore the provisions of section 402 (c) of the Tariff Act of 1930 are applicable; said section reads as follows:

SEC. 402. * * *

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the first decision of the single judge, dismissing the Government's appeal for reappraisement, it was held that, upon the principles enunciated by this court in the case of *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158, the market in Genoa for such merchandise as is here involved was a controlled market and therefore could not be considered in determining the foreign value of the instant merchandise. He therefore dismissed the Government's appeal upon the ground that it had not made out a *prima facie* case.

In his decision upon rehearing the single judge reviewed said *Goodyear* case at length, and also other decisions of this court, and concluded that none of the cases so reviewed was applicable to the case at bar. He then found that the market at Genoa was not a controlled market in the sense that it could not be considered in determining the foreign value of the merchandise in question, and found that the principal market for such merchandise was Genoa, and that such merchandise was there freely offered for sale to "all purchasers in the ordinary course of trade in the usual wholesale quantities at a freely offered price, without any limitation as to use or resale." Upon such finding he held that the foreign value of the merchandise was 0.93 lira per gram, plus 2½ per centum sales tax, plus packing.

In reversing the judgment of the trial court, the appellate division held that the trial court was in error in finding that Genoa was a free

market for such merchandise as is here involved, and in support of its view relied upon the case of *Goodyear Tire & Rubber Co.* v. *United States, supra.* Having found, for the reasons stated by it, that the market in Genoa could not be considered in determining the foreign value of the involved merchandise, it held that a market for such merchandise existed at Campo Ligure and that the price of such merchandise in that market, or 0.60 lira per gram, should determine the *per se* foreign value of the involved merchandise.

The question of whether or not the market at Genoa was such a market as to afford a basis for determining the foreign value of the involved merchandise depends upon the answer to the following question: Does the fixing of prices of merchandise by an association of dealers, at which prices merchandise shall be offered for sale by its members without any restriction upon the resale or other disposition of the merchandise by purchasers from such dealers, create a controlled or restricted market to the extent that merchandise sold by the members of such association should not be considered as "freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade," as provided by said section 402 (c)?

This precise question has never been before this court, and it does not seem ever to have been presented to any court prior to the institution of this proceeding.

The question of controlled or restricted sales in considering the value of imported merchandise has been before this court in a number of cases; but in each one of them, as we shall hereinafter point out, there was some control or restriction as to the resale or other disposition of the merchandise by the purchaser. In the case of *Goodyear Tire & Rubber Co.* v. *United States, supra,* the opinion states in part as follows:

This appeal raises the question as to the validity of the appraisement of automobile tires imported from Canada. The tires were purchased by the Goodyear Tire & Rubber Co., of Akron, Ohio, from the Goodyear Tire & Rubber Co., of Toronto, a corporation wholly independent of the importer, although having the same name and president. The tires are manufactured in Canada and their distribution, sale, and the prices at which sold in Canada are absolutely under the control and controlled by the manufacturer from the time they leave the factory until they reach the hands of the ultimate consumer. The tires are distributed by 13 or 14 agencies of the Goodyear Co. and by a limited number of jobbers and dealers whose operations are restricted to districts selected and defined by the corporation. The corporation sells to exporters, to manufacturers of automobiles, to jobbers, and to dealers at a price graded and definitely fixed for each of the four classes of buyers. The prices at which jobbers may sell to dealers or service stations, and dealers and service stations may sell to consumers, are likewise fixed by the corporation. The exporter has the privilege of buying at the lowest price, and anyone may buy tires for exportation provided he agrees to ship them out of Canada.

The manufacturer of automobiles is favored with a lower price than that prescribed for the jobber or dealer, but the tires purchased by him can not be sold except as part of the manufactured car. * * *

\* \* \* \* \* \* \*

As pointed out by the Government, there is a tendency, especially among manufacturers of patented articles, to "thwart the normal effects of competition" by retaining complete control of the sales and distribution of their product until it reaches the hands of the consumer. But it can not be safely contended that that is "the ordinary course of trade" and much less that Congress recognized such marketing as a standard for determining values for tariff purposes. Far from indicating approval of such a course of trade, we think that the radical difference between the original and the present statutory definition of market value, as well as legislation permitting in certain contingencies the liquidation of duties on cost of production, or even on wholesale prices in the open market in the United States, demonstrates that Congress intended that prices fixed by a manufacturer in a market restricted and absolutely controlled by him should *not* be a factor in determining the dutiable value of merchandise. * * *

From the foregoing it is at once apparent that much more was involved in that case than the mere element of price fixing which is here under consideration. The factors there present upon which the decision rested were the control of the merchandise by the manufacturer from factory to consumer, and restrictions upon its resale in Canada by purchasers.

None of these factors are present in the case at bar, and it is clear to us that said decision does not control the answer to the question here under consideration.

The next case to come before this court in which the question of a controlled price of merchandise is discussed is the case of *United States* v. *Davies, Turner & Co.*, 13 Ct. Cust. Appls. 547, T. D. 41430, which involved the value of certain beeswax imported from France under the Tariff Act of 1922. The precise question was as to what were the usual wholesale quantities sold or offered for sale in France. This court held that there was substantial evidence that the usual wholesale quantities were 2000 kilos or more. With respect to sales in lesser quantities the court said:

The special agent did not report what the trade in France regarded as the usual wholesale quantity of this beeswax in the ordinary course of business, or that he had tried to ascertain or had ascertained the same, apparently leaving that to be inferred from the sales made by the manufacturer as reported by the agent. The agent did state that he ascertained from Dumont that there was a syndicate, with headquarters near Paris, which controlled the prices of beeswax, apparently for home consumption; that in case a competitor, not a member of the syndicate, quoted a lower price, the syndicate authorized its members to meet such reduction; that the price fixed for home consumption had no bearing on export prices and the "manufacturers were free to offer their wax for export at whatever prices they cared to."

The special agent's report does not show whether or not the manufacturer's books disclosed other sales, at about the time of the exportation in this case, of beeswax in lots of between 500 and 2,000 kilos, or why he did not try to ascertain

what were regarded as usual wholesale quantities of this commodity by the trade in France.

It may be assumed that an inference may be drawn from what he does report that in quantities of from 100 to about 500 kilos the controlled market value or price in France was, as the Government claims, practically francs 11.50 per kilo, but a controlled price is not necessarily the price at which a commodity can be said to be *freely offered for sale to all purchasers*, especially when it appears, as in this case, that the syndicate members were at liberty to meet any lower price made by nonsyndicate competitors. So far as this phase of the case is concerned it is doubtful if, when considered in connection with the letter from the manufacturer before referred to, the evidence establishes that there was any foreign market price or value for quantities of less than 500 kilos. It rather appears that syndicate manufacturers charged the controlled price if they could get it and, if not, took less.

In *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158, we somewhat exhaustively considered the question as to whether or not a controlled price constituted foreign market value, and pointed out that such price was not such market value within the meaning of that term as defined by law, because merchandise, the price of which was so controlled, was not freely offered for sale in contemplation of law. It is true that in that case the control was probably more complete and was brought about in a different manner than in this, but the purpose, if not the effect thereof, certainly is substantially the same in the two cases.

It is true that the last paragraph of the above quotation would seem to sustain appellee's view that merchandise sold at a price fixed by dealers was a controlled price which prevented such price from being considered in determining foreign value of merchandise. However, it is clear from the opinion that said paragraph last above quoted was not necessary to a decision in that case, as appears from the paragraph immediately preceding, above quoted.

Were it necessary to analyze the statement in the last paragraph of the above quotation, we might discuss the effect of the phrase "but the purpose, if not the effect thereof." It would seem that a mere *purpose* not *effected* could not have any bearing upon the question of controlled or restricted sales. At any rate, it is not our present view that the mere fixing of prices, without any restriction upon the disposition of the merchandise by the purchaser, is the same in legal effect as the fixing of prices with such restrictions.

Appellee points out an expression of this court in the case of *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299, T. D. 40313, as indicating the view of this court that monopolistic prices should not be considered in determining the American selling price of imported merchandise under subdivision (f) of section 402 of the Tariff Act of 1922. In his brief counsel for appellee quotes from said opinion as follows:

The American selling price and the United States value, as defined in administrative section 402, do not permit the making of artificial prices or the control by domestic interests of the duties to be assessed on foreign goods. * * *

We think it proper to quote the language immediately following the language above quoted, as follows:

* * * The American selling price and United States value is not the price at which domestic products are offered to a favored few in limited quantities in a market specially created or restricted for the purpose of fixing the duties to be assessed on importations, but it is the price at which such products are freely offered for sale to all comers in the usual wholesale quantities and in the principal markets established for such goods in the ordinary course of trade. Individuals, firms, or corporations having a monopoly of some particular commodity can not establish the statutory American selling price by special fictitious offerings or by sales to controlled or favored purchasers or by transfers of less than the usual wholesale quantities or by transactions in a market not recognized by the trade and not developed in the ordinary course of business.

Combining the two quotations and reading the paragraph as a whole, if any inference may be drawn therefrom bearing upon the question before us, it would seem that the fixing of prices by domestic interests, without any restriction as to purchasers, or disposition of purchased merchandise by them, would not constitute a controlled market preventing such prices from being considered in determining the American selling price of imported merchandise under the said Tariff Act of 1922.

The case of *Meadows, Wye & Co. (Inc.)* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324, involved restricted sales, the restriction going to the price at which purchasers might resell the purchased merchandise. Therefore this case has no application to the case at bar.

Appellee relies upon our decision in the case of *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. (Customs) 344, T. D. 46114, in support of his contention that a controlled market existed in Genoa for the merchandise in question. That case involved the reappraisement of certain phosphate under the Antidumping Act of 1921. After a statement of the facts there involved, we said:

From this rather extended review of the facts, it appears that the phosphate industry of the French protectorate in Morocco is a governmental monopoly, subsidized by governmental funds and subject to governmental control in production, sale, and price fixation. Not only does this governmental control exist in Morocco, but it follows the product into foreign lands and controls and limits its sales there. Not a pound of Moroccan phosphate can be sold in any country except under conditions imposed or approved by the Cherifien Government.

We there held that restrictions imposed upon the resale and disposition of the phosphate prevented the prices at which it was sold in Morocco from being considered in determining foreign value, and in fact we held that, because of such restrictions, no foreign value was shown in the record.

It is interesting to observe that the prices of the phosphate there involved were fixed by a Government monopoly, but neither this

court nor the United States Customs Court in that case held that such monopolistic prices *alone* would prevent the finding of a foreign value of the phosphate. It was because of restrictions in the use and sale of the phosphate, imposed by a Government-controlled monopoly, that we found the market was restricted, and that therefore the prices at which the phosphate was sold could not be considered. It is proper to observe that the question of whether prices fixed by a Government monopoly, without restrictions upon resale or use of merchandise, constitute such a controlled market as to prevent a foreign value being found for such merchandise, was not raised in the *Cottman* case, *supra*, and that question is not involved in the case at bar.

It is true that the opinion in said *Cottman* case contains the following paragraph:

Foreign-market value, in our opinion, as defined in this statute was intended by the Congress to mean such conditions as exist in a free, open, unrestricted market, where people meet under normal competitive conditions to buy and sell their goods.

It is clear, however, from the entire opinion that we did not intend to hold that in order to constitute foreign market value there must in such market be competition in the price at which such article is sold. Had that been our view there would have been no occasion for remanding for a new trial the first *Cottman* case, *United States* v. *J. H. Cottman & Co.*, 18 C. C. P. A. (Customs) 132, T. D. 44095 (the second *Cottman* case being an appeal to this court from the judgment of the Customs Court entered upon the retrial of the first case) and in the second case there would have been no occasion for the very extended discussion in the opinion of whether the restrictions in the use and subsequent sale of the phosphate there involved constituted a restricted market.

Whether or not the fixing of prices, by a Government monopoly, of a product produced abroad, or Government subsidy to the manufacturers thereof, creates a controlled market preventing a foreign or export value being found for such merchandise, we need not here determine. It is only necessary to say, with respect to said second *Cottman* case, that it does not in our opinion support the contention by appellee here that Genoa may not be considered as a principal market for merchandise of the character here involved.

The case of *United States* v. *Philip Wirth et al.*, 20 C. C. P. A. (Customs) 94, T. D. 45705, involved the reappraisement of certain asbestos filters, and parts thereof. It appeared that the German manufacturer required jobbers and dealers to resell at prices dictated by him, and exportation of the merchandise by the purchasers was prohibited. We held this constituted a controlled or restricted market and that there was no substantial evidence to establish a foreign

value of the merchandise, under the doctrine of the *Goodyear Tire & Rubber Co.* case, *supra*, which we have hereinbefore discussed. Obviously our decision in said *Wirth et al.* case has no application to the case at bar.

From the cases herein reviewed, and others examined by us, we find nothing in any of the opinions of this court to the effect that mere price fixing by an association, where that is the ordinary course of trade with respect to such merchandise, without any restriction upon the resale or disposition of the merchandise by the purchasers thereof, constitutes a controlled or restricted market, unless it be the cases of *United States v. Davies, Turner & Co., supra,* and *J. H. Cottman & Co. v. United States,* 20 C. C. P. A. (Customs) 344, T. D. 46114, which cases we have hereinbefore discussed.

We are therefore free to consider the question before us as one without adjudicated cases to guide us.

We would first observe that to hold that the mere fixing of prices of merchandise by an association of dealers, without any restriction upon the purchaser thereof, prevents such prices, if freely offered in the ordinary course of trade as the statute provides, from being considered in determining the dutiable value of merchandise, would in all probability prevent any finding of foreign or export value respecting a very large volume of importations of merchandise dutiable at an ad valorem rate. While this fact alone, of course, should not be controlling in determining the question at issue, it is a factor proper to be considered in determining the intent of Congress in the enactment of section 402 (c). We have had many cases before us where it appeared that foreign prices of merchandise have been fixed by cartels or syndicates such as that referred to in the case of *United States v. Davies, Turner & Co., supra,* but, so far as we can learn from the adjudicated cases, it has never before been contended that this fact alone prevents a finding of foreign or export value of imported merchandise.

Again, if the appellate division is correct in holding that the mere fact of fixing of prices by an association of dealers, without any restriction upon the purchasers of the merchandise, constitutes a controlled or restricted market in the sense that we are discussing, it must be because such an agreement prevents competition between dealers in pricing their merchandise to purchasers, and it would thus necessarily follow that competition with respect to *price* of merchandise is an indispensable element of a free market. If it be true that there must in all cases be competition in the price of an article in order to make a free market therefor, there might never be found, under certain circumstances, a foreign or export value for patented articles. We have had many cases where it was apparent that there was no competition in the price of an imported article; but if the article was freely offered for sale by the

manufacturer in the country of exportation in the usual wholesale quantities and in the ordinary course of trade, this was held to be sufficient to establish foreign value if no "such or similar" merchandise was offered for sale by other manufacturers.

We are constrained to hold that competition in the price of merchandise in the country of exportation is not an indispensable element in establishing the foreign value thereof, and it necessarily follows that the mere fact that an association fixes the price at which its members shall sell merchandise, without any restrictions upon the purchasers thereof, does not constitute a controlled or restricted sale in the sense that such price may not be considered in determining the foreign value of merchandise.

Moreover, the statute provides that—

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, * * *.

It is obvious that the phrase "ordinary course of trade" applies to the course of trade in the principal markets of the country from which the merchandise is exported, and not to the ordinary course of trade in the United States.

In the case at bar, it appears from the record that it is the ordinary course of trade in Genoa for an association of dealers to fix the prices of merchandise such as is here involved, but without any restrictions upon the purchaser as to resale or use of the merchandise.

We therefore hold that the appellate division erred in holding that the fixing of prices by the association referred to constituted a controlled market to the extent that the prices so fixed could not be considered in determining the foreign value of the merchandise in question.

We next come to the minor question raised by appellee in his brief, and upon oral argument, to wit, that the evidence introduced by the Government was insufficient to overcome the presumption of correctness of the valuation made by the local appraiser.

The merchandise here involved being imported in 1931, the following provision of section 501 of the Tariff Act of 1930 is applicable in considering the case, to wit:

* * * The value found by the appraiser shall be presumed to be the value of the merchandise and the burden shall rest upon the party who challenges its correctness to prove otherwise.

Of course, if the market in Genoa was a controlled market, as held by the appellate division, then the Government has not established a *prima facie* case overcoming the presumption of the correctness of the valuation made by the local appraiser. We, however, hold that

the market in Genoa was not a controlled market in the sense that the prices in such market could not be considered in determining the foreign value of the merchandise in question. It is to be noted that section 402 (c) uses the term "principal markets," and the query arises whether proof by the Government showing that the market at Genoa was the principal market for such merchandise as is here involved was sufficient to overcome the presumption of the correctness of the valuation found by the local appraiser. The report of the Treasury attaché in evidence states as follows:

The principal market for the sale of the filigree silver, both for the home market and for export, is in Genoa. All the leading firms who sell this merchandise are situated in Genoa. * * *

We do not think that a reasonable construction of section 402 (c) required that the Government, having shown the principal market for merchandise such as is here involved, as above indicated, should go further and show that there were no other principal markets in Italy for such merchandise. In our opinion, to overcome the presumption of the correctness of the valuation of the local appraiser, it was sufficient for the Government to show that Genoa was the principal market for such merchandise as is here involved, and that in such market said merchandise was freely offered for sale in the usual wholesale quantities in the ordinary course of trade at 0.93 lira per gram.

The United States Treasury report, *supra*, stated:

* * * *All* the leading firms who sell this merchandise are situated in Genoa. * * * (Italics ours.)

If all the leading firms were situated in Genoa, as the report states, there could not have been any principal market elsewhere in Italy.

If the importer, appellee, was of the opinion that Campo Ligure was a principal market for such merchandise, that fact should have been established by evidence. We find no evidence in the record upon that subject, and the appellate division of the Customs Court did not find that Campo Ligure was a principal market for such merchandise, but found only that there was "a market at Campo Ligure." We find no substantial evidence that Campo Ligure was a principal market for such merchandise as is here involved.

For the reasons stated, the judgment of the United States Customs Court, First Division, is *reversed* and the cause is *remanded* for further proceedings consistent with the views herein expressed.

### DISSENTING OPINION

GRAHAM, Presiding Judge: I find myself compelled to dissent from the majority opinion in this case for reasons which I will state in as

brief a form as is possible, contenting myself not with an exhaustive discussion of the authorities, but with a brief statement of what I consider to be the issues involved.

This is a reappraisement matter. The local appraiser found the foreign value of the imported goods to be 0.60 lira per gram, plus sales tax and packing. This appraisement was made under section 402 (c) of the Tariff Act of 1930, and, therefore, was the local appraiser's ascertainment of the "market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the *principal markets* of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States." (Italics are mine.)

The Government attacked this appraisement, and hence it had the burden of establishing that the appraisement made by the local appraiser was not the foreign value "in the principal markets" of the country of export. If the goods were freely offered for sale at Campo Ligure, and as to this there is positive proof by the affidavit of the witness Bongera Domenico, and if Campo Ligure was one of the principal markets of Italy, and if, further, the market value within the scope of said paragraph 402 (c) was 0.60 lira per gram, then the First Appellate Division was justified in the conclusion reached by it. There is nothing in the record to prove that there was not such a principal market. The report of the Government agent, Exhibit 1, is the only thing in the record which might be felt to contradict this finding of the local appraiser. In this statement: "The principal market for the sale of the filigree silver, both for the home market and for export, is in Genoa", it may well be that Genoa is the principal market; however, Campo Ligure may be one of the principal markets, and, so far as the record shows, the local appraiser has so found. The Government must prove otherwise if it is to succeed. Section 501, Tariff Act of 1930.

Therefore, on the facts, I am of opinion that the Government has not sustained its burden of proof.

The majority opinion is written on the theory that this record establishes a foreign value for the imported goods at 0.93 lira per gram, based upon the selling price at Genoa. In so finding, the view of the majority is that the facts do not establish a controlled market, within the meaning of the former decisions of this court, at Genoa, but that the market there must be considered one "at which such or similar merchandise is freely offered for sale to all purchasers * * * in the usual wholesale quantities and in the ordinary course of trade."

The facts as to such market, as shown by the record, are these: An association which has been in existence for over three years, and to which association *"all dealers without exception"* belong, fixes the prices on this product in the Genoa district. The term *"all dealers"* is not limited by the proof, and hence includes all kinds of dealers, both wholesale and retail, if there be any such. Thus the proof shows that from the time the goods leave the association until they reach the hands of the consumer, the prices are fixed and unchangeable, except by the association. From the record, it fairly appears that this silver filigree is used as material for making jewelry, and other similar articles. Therefore, the manufacturer who purchases it to make jewelry is the consumer. The market, then, at Genoa, is a controlled market to this degree, that there is no competition and can be no competition in prices, between the association and the consumer.

The majority opinion, however, arrives at the conclusion that this does not constitute a controlled market, within the spirit of our decisions in many cases. This conclusion is based largely on the view expressed that the control, while it may extend to the prices of the product at Genoa, does not follow the goods into the hands of the consumer.

In my judgment, such a conclusion is in conflict with almost everything we have said in former cases on this subject, as I shall attempt to show by a very brief summary of the cases.

Let us first look at *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158. In this case, the manufacturer sold its tires through a limited number of jobbers and dealers. No other purchasers were allowed and the prices were fixed and graded by the manufacturer, for each and every class of buyers, so that the price was regulated from the manufacturer to the ultimate consumer. This court held that no foreign market value was established by proof of such controlled market. In that case, the Government made exactly the same contention that it makes here, namely, that if a manufacturer succeeds in controlling the market in such a way that the goods cannot be bought in any other manner, then the method so established becomes the usual method in which such merchandise is sold at wholesale in the ordinary course of trade. However, this court refused to adopt this theory and said it might be the ordinary course of trade in that commodity, but that it was not the ordinary course of trade which the law had in mind. Thereupon, this court, speaking through Smith, Judge, made this expression:

It may be that a manufacturer's control of sales and distribution from the time they leave his factory until they reach the ultimate consumer is the "ordinary course of trade" for the marketing of *his* merchandise, but we are not prepared to admit that it is the ordinary course of trade for supplying consumers

with tires or other goods. In other words, price-fixing and restriction of distributing agencies may be the ordinary course of trade in Canada for the furnishing of *Goodyear* tires to the public, but it can hardly be said that it is the ordinary course of trade for the marketing of automobile tires or for the marketing of merchandise in general.

\* \* \* \* \* \* \*

\* \* \* Far from indicating approval of such a course of trade, we think that the radical difference between the original and the present statutory definition of market value, as well as legislation permitting in certain contingencies the liquidation of duties on cost of production, or even on wholesale prices in the open market in the United States, demonstrates that Congress intended that prices fixed by a manufacturer in a market restricted and absolutely controlled by him should *not* be a factor in determining the dutiable value of merchandise.

Again, Judge Smith said: .

\* \* \* Indeed, if prices fixed by the manufacturer in markets restricted and absolutely controlled by him constitutes market value within the intention of paragraph R, Section III, then the phrase "freely offered for sale to all purchasers" becomes utterly meaningless. More than that, if fixed prices in such a restricted market be actual market value, then the manufacturer who fixes prices and controls the market has the power to make a market value to his liking and thereby determine in some measure the duties to be paid on his product—*a power which might well be exercised not to protect jobbers, dealers, and consumers, as in this case, but to reduce duties on goods manufactured largely or wholly for foreign consumption.* (Italics mine).

After these expressions, Judge Smith then used the expression quoted in the majority opinion, and a part of which holds that the goods were not "freely offered for sale to all purchasers" and in which the opinion italicizes the words "freely" and "all purchasers."

Now, it must be obvious to the reader of this opinion that this court was discussing two propositions: Not only did it hold that the goods were not freely offered to all purchasers because of the restricted number of persons who could buy, but it was proceeding to discuss the broader aspect of the case, namely, that the control of the market price produced such a condition as to defeat "the manifest purpose of Congress that duty should not be determined by factory fixed prices in a factory controlled market."

This double aspect of the case was so apparent that the Assistant Attorney General, in applying for a rehearing before Judge Dallinger in this case, applied for it merely because of the distinction between the *Goodyear* case and the case at bar in this respect, namely, that in the *Goodyear* case those who could buy were restricted in number, while in the case at bar, anybody could buy. On this theory, the Government claimed a distinction between the cases and obtained a rehearing. However, when the matter was reheard, it was not decided upon the stated distinction, but upon the theory that the cases were different in the matter of the control exercised in each case. The single judge stated, "nor does the manufacturer fix the price at which jobbers must sell to dealers and dealers to consumers. In a

word, there is no attempt by a manufacturer to control the sales, distribution, and selling prices of his merchandise from the time it leaves the factory until it reaches the ultimate consumer."

Therein, obviously, the single justice misconstrued the record. The prices were fixed for "all dealers." There is no distinction made in the record between wholesalers, jobbers, or retailers. All are dealers. Hence, from association to consumer, the prices were fixed and controlled.

It cannot be said that what this court said as to a controlled price in the *Goodyear* case was *obiter*. It was a discussion of an issue then in the case and an issue which is the only issue in the case before us. It was the expression of the unanimous views of this court that a factory controlled price was and is not sufficient to establish foreign market value.

In *United States* v. *Davies, Turner & Co.*, 13 Ct. Cust. Appls. 547, T. D. 41430, in commenting upon the *Goodyear* case, *supra*, this court, speaking through Barber, Judge, stated that we had pointed out in the *Goodyear* case that a controlled price did not constitute a foreign market value "within the meaning of that term as defined by law, because merchandise, the price of which was so controlled, was not freely offered for sale in the contemplation of law." Then he makes this suggestion: "It is true that in that case the control was probably more complete and was brought about in a different manner than in this, but the purpose, if not the effect thereof, certainly is *substantially the same in the two cases.*" (Italics mine.)

I think, without exception, up to the present time, this court has always taken the view which we expressed in *Cottman & Co.* v. *United States*, 20 Ct. Cust. Appls. 344, 357, T. D. 46114, where we said: "Foreign-market value, in our opinion, as defined in this statute was intended by the Congress to mean such conditions as exist in a free, open, unrestricted market, where people meet under normal competitive conditions to buy and sell their goods."

The expression above was not *obiter* in that case, but was directly pertinent to whether a foreign value existed for Moroccan phosphate rock.

In *Meadows, Wye & Co.* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324, this court, speaking through Hatfield, Judge, was discussing a question of foreign value. In so doing, it was said:

In view of the fact that the manufacturer restricts the market for the involved merchandise to those firms and individuals who will agree to resell at prices not less than those fixed by the manufacturer, and, as the manufacturer's prices are the same regardless of the quantity purchased, we are of opinion that the merchandise is not freely offered for sale to all purchasers in the principal markets of Great Britain, in the usual wholesale quantities and in the ordinary course of trade, and that the issue is controlled by our decision in the *Goodyear Tire & Rubber Co.*, and the *Richard & Co.* cases, *supra*. We so hold.

Here, this court expressed the view that if prices were fixed by the manufacturer, and if the goods were sold only to persons who would agree to resell them at the manufacturer's prices, the market was controlled and no foreign value existed. Compare that with the case at bar. The proof is that *all dealers* belong to the association, and are fined if they vary from the prices fixed by the association. Certainly, therefore, it follows that there is an agreement among these dealers, and that only such dealers as belong to the association can handle the product. It will not be contended, I dare say, that the fining of a member is done by the State. It must be the result of joint agreement or understanding, a membership in the association. Therefore, following the dictum of Judge Hatfield in the *Meadows, Wye* case, *supra*, the price is controlled and the market is limited to the members of the association.

Again Judge Hatfield, in expressing the views of this court in *United States* v. *Wirth*, 20 C. C. P. A. (Customs) 94, T. D. 45705, stated this:

\* \* \* Furthermore, the jobbers and dealers are required to resell at prices dictated and controlled by the manufacturer. They are prohibited from exporting. It is upon these conditions only that the goods are sold to them. Obviously, then, the evidence discloses a controlled, not a free and open, market, and such restricted sales are not indicative of foreign value.

Without going further into the judicial construction of the term "foreign value" by this court, it is sufficient to say that the decisions have not been based upon the fact that the use and sale of the product is controlled in the hands of the consumer, but if the control from the manufacturer to the consumer was restricted and controlled, that was sufficient to result in a finding that such market would not come within the statutory definition necessary to constitute foreign value. In fact, in many cases, the product was not controlled in the hands of the consumer; as, for instance, in the *Goodyear* case, where the tires purchased might be used or resold by the consumer in any way he might desire. In the *Cottman* case, there was such control in Morocco of the use or resale of the rock phosphate, but that is not true in the majority of the adjudged cases.

As a matter of fact, this court has always proceeded upon the theory that the value that was intended to constitute a foreign value, was, as stated in the *Cottman* case, a free, open market where buyer and seller might meet under ordinary competitive, and not extraordinary, conditions.

It has been suggested that to hold that the facts here involved constitute a closed and controller market, would do away with the possibility of one who had a patented article, to control the market in such article. As a matter of fact, that very thought was in the

mind of this court when Judge Smith, in the *Goodyear* case, *supra,* said:

> As pointed out by the Government, there is a tendency, especially among *manufacturers of patented articles,* to "thwart the normal effects of competition" by retaining complete control of the sales and distribution of their product until it reaches the hands of the consumer. But it can not be safely contended that that is "the ordinary course of trade" and much less that Congress recognized such marketing as a standard for determining values for tariff purposes. * * * (Italics mine.)

These are, briefly, my views, and it is unnecessary to further prolong the expression of the same.

It may be that to come to this conclusion would, under present world existing conditions, destroy foreign value in many foreign countries. However, this is no reason for a change in our construction of these statutes, in order to care for changing foreign political and trade conditions. The legislative body is at hand, and can, at any time, make any necessary changes in the method of ascertainment of value on dutiable goods which enter the country. If such changes are necessary, it is the legislative duty, not ours. We have adhered, for years, to judicial views which are well known to the Congress. To depart from these views now, because of differing world conditions, is ill-advised.

One other suggestion and I have said all that I care to say. One of the titles of the Emergency Tariff Act of May 27, 1921, which has been retained and is now a part of our law, is Title II, Antidumping Act, 1921. This act provides, in part, (section 202 (a)), that if merchandise be sold in this country at less than its foreign market value or cost of production, that to compensate for the same there shall be levied an antidumping duty equal to the difference between the actual sales price and the foreign market value or cost of production.

Let us assume that a foreign monopoly, not governmental, but a bund, kartel, syndicate, or other like association, desires to invade the commerce of this country, and for that purpose lowers its price to less than the cost of production; and let us assume that the goods, chiefly intended for sale abroad, are thus offered for sale to all purchasers in the country of production. Thereupon, according to the opinion of the majority in this case, such controlled price in the country of exportation constitutes a foreign market value, and no antidumping duty may be levied, because the goods are not being sold abroad at less than the foreign market value. Thus, the purpose of the antidumping act is defeated, and it is within the power of such an association in a foreign country to not only dictate the amount of duties which shall be collected in this country, but to destroy industries here without any remedy, so far as the antidumping act is concerned. I do not believe that the law-makers intended any such

results, nor do I believe it can be accomplished if we adhere to what I think to have been our uniform holdings on the question of controlled markets.

My conclusion is that there was no foreign value established for the goods manufactured at Genoa, and that the First Appellate Division correctly concluded that the prices at Campo Ligure were properly accepted by the local appraiser, as proof of foreign value.