ALKA BOTTLE CAPPING MACHINE CO. v. UNITED STATES

No. 5990.—Invoice dated Linkoping, Sweden, September 12, 1938.
Certified September 13, 1938.
Entered at New York, N. Y., September 27, 1938.

(Decided March 20; 1944)

*Baer & Marks* (*Eli D. Goldsmith, Julius B. Baer,* and *Donald Marks* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett* and *Arthur R. Martoccia,* special attorneys), for the defendant.

LAWRENCE, Judge: An importation from Sweden was invoiced as "1-Alka Capping Machine Type B 10, right-hand rotating, complete but exclusive of El. motor, Machine No. 1820" and "1-Alka Capping Machine Type B 10, left-hand rotating, complete but exclusive of El. motor, Machine No. 1821," respectively. They were appraised at a total sum of 36,615.70 Swedish kronor net, as representing the foreign value, under section 402 (c) of the Tariff Act of 1930.

The invoice also bears a red-ink notation which reads "Excess Spare Parts of Machines n. s. p. f. Appr. value Sw. Kr. 1256  *  *  *."

The erroneous appraisal of the machines in a lump sum as above set forth was doubtless inadvertent, inasmuch as the record shows that the Government examiner noted in lead pencil on the invoice the unit value of each machine as "18200 Sw. Kr. ea. plus pkg." (Note section 500 (a) (1) and (e) of said act.)

Notwithstanding the foregoing circumstances, it is incumbent upon me to determine the value of the merchandise (section 501 of said act) if the necessary elements of value, as defined in section 402 of said act, are established by the record. *United States* v. *F. W. Woolworth Co. et al.*, 22 C. C. P. A. (Customs) 184, T. D. 47126.

Plaintiff contends that there is neither a foreign, nor an export, nor a United States value for such or similar merchandise, and that it has established the cost of production of said machines as defined in section 402 (f) of said act, which should be adopted as the value of said merchandise.

The Government contends in its brief that the evidence establishes a foreign value for said merchandise as defined in section 402 (c), *supra*. It concedes that there is no export value, but asserts that plaintiff has failed to prove United States value as a condition precedent to invoking cost of production. It further contends that the appeal for reappraisement, so far as it relates to "Excess Spare Parts," should be dismissed on the ground that said parts were neither invoiced nor entered.

By its appeal for reappraisement plaintiff has undertaken the burden of proving that there is no foreign, export, or United States value for this merchandise, and that the value should be based upon the cost of production as defined in section 402 (f), *supra*.

It being conceded by both parties that there is no export value, it becomes a matter of first importance to determine whether plaintiff has proved the absence of a foreign value for the merchandise as defined in section 402 (c), *supra*. In support of this contention plaintiff relies largely upon the information contained in the affidavit of Gunnar Rooth (exhibit 1).

Affiant describes himself as the general manager of Alka Aluminiumkapslar of Linkoping, Sweden, which manufactures various types of bottle-capping machines, of which the B–10, *supra*, is one type.

He further deposes that his company sold bottle-capping machines in Sweden to two "dealers" only, and—

* * * divided the sale territories in northern Sweden and southern Sweden between them respectively. Aside from the sales made to these special dealers, representing the northern and southern half of Sweden respectively, Alka made no other sales in Sweden for home consumption. The special dealers in Sweden sold only to consumers in their particular territory and the terms and conditions of sale were, in all instances, fixed by Alka. These machines sold to users by the special dealers in Sweden, were installed, serviced, and repaired in Sweden by the manufacturing company itself.

Deponent further states that—

In order to fill the varied requirements of different bottlers my company has designed a series of types and sizes of capping machines based upon Alka's originally patented apparatus. One of these styles or types will, in each case, constitute the basic apparatus from which the complete machine is built for the particular requirements of the buyer. Upon this basic machine is constructed those devices, dies, stamps, and motors of particular character and speed required to meet the consumers' specific needs.

It appears that specific machines were not kept on hand for sale or display; that it was the usual custom for—

dealers to display an Alka bottle-capping machine by arranging for prospective customers to visit any one of the plants where the machines built by Alka were in operation.

Deponent also declares that—

In many instances where these machines were constructed for sale outside of Sweden, various parts, motors, and gears of specific size could be obtained in the particular country where the machine was to be installed for use. Information of this sort having first been received from the dealer, we would thereupon omit from the machine those parts which could be supplied in the country of use. In the case of the B–10 machines shipped to Mr. Dessing in 1938, we omitted certain electric motors, gears, and sprockets which he could obtain in the United States. Of course, in Sweden, the entire machine was constructed by the manufacturer, in accordance with plans and details submitted by the dealer.

He also stated that his company did not build any machines such as those in this importation for use in Sweden during 1938.

Plaintiff's witness Dessing, manager of the importing company, who showed great familiarity with these machines, testified that they were made to order; that no two were alike; that there were no standard prices; that there were differences in the cutting dies and stamps required for different types of bottles; that conveyors, gears, and pulleys had to be changed; and that while the machines were built in accordance with basic patents, nevertheless certain parts required alteration to meet the required needs of each customer.

The Government introduced, as collective exhibit 9, the report of Treasury representative Charles Kruszewski, in which it is stated that the—

Manufacturer freely offers and sells identical B 10 machines in Sweden. The current price according to typed price list on file of manufacturer is Sw. Kr.

18,200.00 unpacked or crated. Delivered fob destination. Not lower at factory because manufacturer usually delivers by own truck. There are two agents in Sweden selling manufacturer's machines in Sweden. One covering the northern part and located in Stockholm; the other covering the southern part and located in Goeteborg. The machines are invoiced to them and from the gross price manufacturer allows these agents 10%. If extra parts are delivered these are charged extra. Erection fees are also charged extra. There is no restriction on the use of the machines by the ultimate purchaser who are always users of the machines.

Attached to said report is a reference to a sale made August 27, 1938, as follows:

August 27, 1938:     Agent A/B Broederne Herrmann,
                                        Stockholm.

Exp. S. 8372   Delivery free Sundsval incl. crating.
Litt. 110                                    30 days net.
*For Sundsvall Brewery A/B., Sundsvall.*

| | Sw. Kr. |
|---|---|
| 1 fully automatic cap making and bottle sealing machine type ALKA B 10, complete, machine No. 1813 Extra for transportation | 18, 200. 00 |
| bench | 68. 50 |
| | 18, 268. 50 |
| 10% commission | 1, 826. 85 |
| | 16, 441. 65 |

Manufacturer added that export packing on this machine would be about Sw. Kr. 150.00 and Sw. Kr. 150.00 for overseas freight, thus explaining the difference between Sw. Kr. 18,500.00 and Sw. Kr. 18,200.00 inland value.

No turnover or other taxes in Sweden.

During the progress of the trial two motions, made by counsel for the Government, were taken under advisement. In the first, counsel moved to dismiss the appeal for reappraisement insofar as it related to "parts" of machines. The testimony of the witness Dessing is positive that the parts referred to were in fact integral and constituent parts of the machines themselves and not excess spare parts as indicated in red ink on the invoice, and I so find. Not only were such parts included in the description of the importation as shown on the invoice, but were included in the unit values set forth there. The motion is therefore denied and an exception allowed.

In the second motion, made near the close of the trial, counsel moved to dismiss the appeal "because of failure to prove a value different than the presumptively correct appraised value." As indicated earlier in this opinion, the value returned by the appraiser was not in accordance with the provisions of section 500 (a) (1) of said act which declares that it shall be the duty of the appraiser "* * * (1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold * * *." Instead, appraisement was made on the totality of quantity. This infirmity, resulting from failure to comply with the statute, deprives the action of the

appraiser of the usual presumption of correctness (section 501, *supra*). Note *United States* v. *F. W. Woolworth Co. et al., supra*, and *United States* v. *Manahan Chemical Co., Inc.*, 24 C. C. P. A. (Customs) 53, T. D. 48333, and cases cited. Accordingly that motion is denied and an exception allowed.

The facts above related satisfy me that at the time of the exportation of the instant machines no foreign value therefor existed in Sweden. The proof fails to show that the imported machines were in a legal sense such as or similar to those sold or freely offered for sale for home consumption in Sweden. While it is true that bottle-capping machines manufactured by the producer in Sweden were all constructed in accordance with basic patents, nevertheless the complete machines were built on order to meet specific requirements of each individual customer, and, as above pointed out, in various instances where machines were sold for export certain parts were omitted because they could readily be supplied in the country to which exported. In the case before me it is notably true that the motors were not imported, and inasmuch as these two machines were built to meet certain specific needs they cannot properly be regarded as machines such as or similar to those sold in Sweden.

The statement in the Treasury representative's report that the "Manufacturer freely offers and sells identical B 10 machines in Sweden" is a conclusion which is not supported by other relevant facts and circumstances of record. As matter of fact the sale referred to by the Treasury representative in an apparent effort to substantiate the statement regarding the sale of "identical B 10 machines in Sweden" describes the article as a "complete" machine, whereas the two imported machines were not complete inasmuch as they did not include the motors. Moreover, the report describes a "fully automatic *cap making* and *bottle sealing* machine * * * " [italics supplied] whereas each machine in this case is a "capping" machine.

In my opinion the record falls far short of establishing that machines such as or similar to the imported machines were freely offered for sale to all purchasers in the principal markets in Sweden in the usual wholesale quantities and in the ordinary course of trade at or about the time of exportation; and I therefore find that foreign value, in the sense defined in section 402 (c) *supra*, did not exist.

In the absence of foreign value, and it being conceded that there is no export value, the next inquiry is whether there was a United States value for the merchandise, as defined in section 402 (e) of said act. Upon this phase of the case the undisputed evidence discloses circumstances similar to those prevailing in Sweden in certain respects. While the machines sold in the United States were constructed in accordance with basic patents of the manufacturer in Sweden, they were nevertheless built up, altered, and changed to meet specific

requirements of the particular user. In other words, the machines sold to consumers in the United States differed in vital respects from the basic type B 10, with the result that not only were there structural differences, depending upon the additional parts required, but the prices varied accordingly.

Moreover, purchasers in the United States were protected in their territories with respect to the use of machines constructed around the B 10 type. For instance, the evidence records a sale of B 10 machines imported by plaintiff to the Pfeiffer Brewing Co. of Detroit, Mich. It appears from a copy of a letter addressed to them by the plaintiff and dated March 2, 1938 (collective exhibit 7) that "in consideration of your purchase of these machines and your payment for same, we will agree not to sell any machines for the same purpose to any person, firm, or corporation within the State of Michigan before December 1, 1938."

The witness Dessing explained that on account of sales resistance, protection of this sort was necessary to promote sales and encourage users of these machines. This I deem to be a restriction of the free offer of machines of this character in the United States in that it limited the number of prospective purchasers. *Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351, T. D. 39158. Accordingly I am of the opinion that machines such as or similar to those here imported were not freely offered for sale for domestic consumption packed ready for delivery in the principal market of the United States to all purchasers at the time of exportation of the imported merchandise in the usual wholesale quantities and in the ordinary course of trade.

It remains finally to be determined whether the evidence establishes the cost of production of the merchandise within the meaning of section 402 (f) of said act. Such proof has been supplied in the affidavit of Gunnar Rooth (exhibit 1) above referred to, and it has been neither contradicted nor challenged by the Government at the trial or in the brief. That evidence discloses the cost of producing type B 10 right-hand rotating Alka bottle-capping machine, No. 1820, complete but exclusive of the electric motor to be—

|  | Sw. Kr. |
|---|---|
| Material | 1, 675. 00 |
| Labor | 2, 623. 00 |
| Cost of fabrication | 4, 075. 00 |
| General expenses, including freight, insurance, etc | 2, 970. 90 |
| Packing | 49. 50 |
| Profit | 3, 819. 00 |
| Total | 15, 212. 40 |

and the cost of producing type B 10 left-hand rotating Alka bottle-capping machine, No. 1821, complete but exclusive of the electric motor to be—

|  | Sw. Kr. |
|---|---|
| Material | 1, 675. 00 |
| Labor | 2, 621. 00 |
| Cost of fabrication | 4, 072. 00 |
| General expenses, including freight, insurance, etc | 2, 968. 90 |
| Packing | 49. 50 |
| Profit | 3, 818. 00 |
| Total | 15, 204. 40 |

I am, therefore, satisfied that the proof offered substantially complies with the requirements of section 402 (f), *supra*, and that it establishes the cost of producing the two imported machines to be Sw. Kr. 15,212.40 for said machine, No. 1820, and Sw. Kr. 15,204.40 for said machine, No. 1821, both packed, and I so find.

Accordingly, I hold as a matter of law that the cost of producing said machines within the meaning of section 402 (f), *supra*, is as stated in the above finding.

Judgment will be entered accordingly.