UNITED STATES v. HEEMSOTH-KERNER CORP. (BAUER TYPE FOUNDRY, INC.)

No. 5722.—Invoice dated Frankfurt, Germany, January 25, 1938.
Certified January 27, 1938.
Entered at New York, N. Y., February 5, 1938.
Entry No. 812338.

Third Division, Appellate Term

(Decided September 22, 1942)

Paul P. Rao, Assistant Attorney General (Dorothy C. Bennett, special attorney), for the appellant.

Benjamin A. Levett for the appellee.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: This is an application for review of the decision of the trial court, Reap. Dec. 5381. The question involved is whether or not certain printing type imported from Germany in January 1938, should be appraised upon the basis of the United States value or the cost of production. The trial court found the proper basis of appraisement to be the cost of production. The Government has appealed from such finding.

The trial court in its decision has set out a comprehensive statement of the testimony and of the exhibits, and conclusions as to the facts contained therein with which we are substantially in agreement. The court stated:

Upon this record I find the following facts:

1. That the Bauer Type Foundry, Inc., is the sole importer and agent in the United States for the printing type constituting the merchandise at bar.

2. That said Bauer Type Foundry, Inc., sells such type to certain so-called distributors or dealers appointed by it.

3. That said Bauer Type Foundry, Inc., binds itself not to permit its type to be sold by any other person in the respective territory of each distributor.

4. That said distributors or dealers sell the said type in their allotted territories only to consumers at the said retail prices fixed by the Bauer Type Foundry, Inc.

5. That in certain sections of the United States outside of the territories allotted to its distributors, the Bauer Type Foundry, Inc., appoints agents who are given the privilege of selling said type in certain specified areas only at the prices fixed by said Bauer Type Foundry, Inc., the agents receiving certain commissions therefor.

6. That the only type sold by the Bauer Type Foundry, Inc., for resale is that sold to the said distributors, 13 in number, no one of whom may sell to any purchaser outside his respective territory.

In our consideration of the evidence we find it pertinent and essential to enlarge upon some of the facts contained in the record. Exhibit 2 consists of a book of orders for the month of January 1938. It contains all of the transactions entered into by the importer during the period of exportation of the instant merchandise, including the sale of printing type in units of "fonts." The Government is not in agreement with the importer's analysis of such sales as set out in collective exhibits A and A–1, considered by the trial court. A careful tabulation by this court of the order sheets contained in exhibit 2 discloses:

First, that there were 841 of such orders involving 828 sales of merchandise, 15 thereof not being printing type; that out of the 813 sales 798 were made throughout the United States and 15 in Canada; that shipment thereof was made from the importer's place of business in New York City and the shipping expenses with few exceptions were charged to the purchasers.

Second, that 536 of said sales were made to consumers in the city of New York at list prices plus 2 per centum tax (in New York City a 2 per centum sales tax is placed upon all retail sales); that 8 additional sales were made in New York City at list prices, no tax being added, making a total of 544 sales at the importer's retail list prices.

Third, that 5 sales were made in New York City to two firms, to wit, Damon & Peets, and Zimmer Printers' Supply, upon which discounts of 20 per centum and 25 per centum respectively were allowed from the list prices.

Fourth, that 99 sales were made at list prices throughout the United States, including 24 sales in New York State; that these sales were made in 23 states; that in 3 of these sales two dealers received the credit and in 32 sales the agents in various territories received credit; that the order sheets failed to note as to the remainder of these sales whether or not credit was given to agents or distributors, although 22 sales were made in territories of distributors and 4 sales in the territory of the St. Louis agent.

Fifth, that 51 sales were made to one distributor at list prices less 30 per centum discount and 95 sales were made to ten distributors in territories throughout the United States who received discounts from list prices of 25 per centum.

Sixth, that 4 sales were made at list prices less 20 per centum discount, to wit, 1 each to E. C. Palmer, New Orleans; Bush-Krebs Co., Louisville, Ky.; Bladen-Mathewson Co., Washington, D. C.; and Kelsey Press, Meriden, Conn.

Seventh, that out of the 15 sales to Canadian firms, three received "trade discounts" from the list prices of 25 per centum upon a total of 8 sales; that one firm, Cornish & Wimpenny, received a 10 per centum "trade discount" upon their first order during January and 20 per centum "trade discount" upon their second order; and that there were five firms to each of whom 1 sale was consummated at the importer's retail list prices, although it is noted that sales to two of these firms were credited to the Universal Book Mart at 20 per centum and the sale to one other firm was credited to the Toronto Type Foundry. The actual sales record for the month of January shows, therefore, that the importer made 643 sales to consumers or users throughout the United States and 146 sales to distributors; that in the United States at least 8 sales were made at list prices less discounts to purchasers who were not distributors or agents and 1 sale was made to an agent at a 20 per centum discount; and that in Canada 5 sales were made at list prices and 10 sales were made at list prices less "trade discounts."

In view of the importer's uncontradicted testimony that in the ordinary course of business sales are made by the importer either directly or through agents to consumers or users at net prices fixed in the retail price list, or by the importer to certain specified distributors

for resale to consumers or users in their respective territories at fixed net prices, we are of the opinion that such sales were not consummated at freely offered prices, packed ready for delivery in the principal market of the United States to *all* purchasers at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade. It might be stressed here that there is but one market in the United States for this class of merchandise, and in such market the importer offers the goods first, to a specified trade, to wit, consumers or users, at fixed prices, and second, to distributors specially selected by the importer who are obliged to sell within specified districts at prices fixed by the importer to consumers or users only and that the price to distributors is granted solely upon condition of resale to users. The control as to use of the merchandise by the distributors may be illustrated by one of the order sheets appearing in exhibit 2, of Mackenzie & Harris, Inc., of San Francisco, a distributor. There it is shown that 5 orders of printing type amounting to $20.75 were used in the distributor's own shop. The importer billed the distributor for $5.18 additional, noting thereon the following: "25% additional for type used in your own shop." In our opinion it is apparent that the merchandise was not freely offered for sale in the United States to all purchasers, inasmuch as it was restricted and controlled in respect to sales to distributors. Even if the sales to consumers or users were regarded as unrestricted when part of the market was restricted, the market becomes restricted and controlled under the law. We are also of the opinion that the 9 sales made by the importer in the United States and the 10 sales in Canada at list prices less discounts or "trade discounts" will not alter the prevailing condition of a restricted market.

A situation analogous to that now before us arose in the case of *Half Moon Manufacturing & Trading Co., Inc.* v. *United States,* Reap. Dec. 4314, 73 Treas. Dec. 1560, relative to the proper value applicable to an importation of metal bottle caps. The caps were appraised on the basis of the foreign value and it was claimed that the only free and open market was the value for export. The evidence disclosed two classes of purchasers in the home market, to wit, sales to dealers at prices fixed by agreement and resale restricted to prices specified by the manufacturers, and sales to manufacturers who used bottle caps as a raw material in bottling merchandise. Neither the dealers nor users were allowed to invade the export market of the manufacturer of the bottle caps. In the export market bottle caps were freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade. The trial court found that the home market was controlled and the sales restricted as to dealers and consequently there was not a free and open market for the sale of bottle caps in the foreign country for home consumption to all

purchasers in that market, and it was held that the export value should be taken as the proper value for duty purposes. Upon appeal to the Third Division of this court, Reap. Dec. 4595, 2 Cust. Ct. 1006, it was held that the single judge correctly interpreted the law as applied to said facts in holding that there was no foreign value for the merchandise as defined in section 402 (c), and that there was a value for export, which was the dutiable value of the merchandise, and that such value was represented by the entered prices.

Upon appeal to the Court of Customs and Patent Appeals, *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C. C. P. A. 1, C. A. D. 115, the Government contended that any restrictions placed upon the sale of the merchandise to users would not create a controlled market or nullify the existence of a foreign value and that a larger proportion of the caps sold in Holland for home consumption was sold to users than to dealers. The appellate court, being of the opinion that the result sought by the Government would be contrary to the principle of all the decisions in analogous or partly analogous cases, affirmed the decision of this court, citing *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158; and other decisions involving the question of controlled markets.

In the case of *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 579, T. D. 41436, the court stated that the prices at which merchandise is sold to a limited number of favored purchasers, or to the retail trade only, in quantities greater or less than the usual wholesale quantities, would not be proper evidence of the market value of such merchandise inasmuch as such prices are not those at which such merchandise is *freely* offered for sale to *all purchasers* in the *usual wholesale* quantities and in the *ordinary course of trade*.

For the reasons stated and in view of the foregoing citations, we hold that the market in the United States is controlled in respect to the printing type here in question and that the United States value is not applicable thereto as a measure of value for duty purposes.

Inasmuch as there is admittedly no foreign or export value and as we find no United States value applicable to the printing type herein, the question arises as to the cost of production applicable to the merchandise.

The Government contends that the inland value appearing upon the invoices represents the proper cost of production and that the trial court erred in adopting the average net profit for the year 1937, derived from the manufacture of 800 or more various types. It is argued by Government counsel that the profit to be established as an element of the cost of production is the exact profit realized by the manufacturer upon type which is the same as the particular items imported. In that connection, the Government contends that the phrase "merchandise of the same general character as the particular

merchandise under consideration" appearing in section 402 (f) refers to merchandise the same or similar to the imported merchandise, and should not be taken as applying to the class of merchandise as a whole.

Section 402 (f), in respect to the profit to be added in determining the cost of production, provides as follows:

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of *merchandise of the same general character as the particular merchandise under consideration,* by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind. [Italics not quoted.]

The affidavit of the manufacturer, exhibit 1, in respect to the profit, discloses that the average profit made by his house represents the usual profit made by manufacturers in Germany in selling this class of merchandise; that in no case has his company's net profit been less than 8 per centum of the total cost of labor, material, fabrication, and general expenses, at a time preceding the date of exportation of the printing type herein. Attached to the affidavit were certain cost sheets taken from the manufacturer's books showing the cost of production in detail of the 14 varieties of type in question, except as to the net profit. As to the profit it was shown to vary according to the style of type and the quantities sold; that there were 800 or more various types and that it was impossible to give the exact net profit upon each item. However, the average net profit of the manufacturer for the past 5 years was given, the profit in 1937 being 10 per centum and in 1938, 9 per centum.

Although the trial court was of the opinion that defendant's exhibit 7, the report of an assistant Treasury attaché in Germany, was of little probative value, we find that said report discloses that the type sold in the home market was not identically the same as that shipped to the United States, being of heavier body and of different size, but that all of the type manufactured is from the same raw material whether it is intended for use in Germany or for export and that the cost of production of the exported type is substantially the same as that made for the home market, as the difference in the size and weight of the type bodies is too small to be of any significance in a comparison of the production cost of the finished type. The evidence produced by the Government, therefore, corroborates evidence of importer that the printing type manufactured for home consumption is of the same general character as printing type manufactured for export to other countries including the United States.

It is well settled that the item of profit under section 402 (f) is to be derived from profit made by the manufacturers upon merchandise of the same general character as the imported merchandise. In the case of *United States* v. *Henry Maier*, 21 C. C. P. A. 41, T. D. 46378,

our appellate court construed the words "merchandise of the same general character." The court stated that the profits of the manufacturer of imported merchandise shall not be the sole criterion in the application of the statute, where there is evidence with respect to profits ordinarily made by other manufacturers of merchandise of the same general character, and that the words "merchandise of the same general character" are not synonymous with the words "such or similar merchandise" and that it is sufficient if the merchandise be of the same general character as that imported.

In the case of *United States* v. *T. E. Ash* (*American Askania Corp.*), *Freedman & Slater*, 23 C. C. P. A. 360, T. D. 48211, the evidence as to the profit taken from the affidavit of the manufacturer and quoted by the appellate court, was as follows:

The amount added by us for profit, over and above all other charges and cost elements, is 15%. We have every reason to believe, from general knowledge of manufacturing and trade practices, that the profit which we have added is approximately the same as would ordinarily be added by manufacturers or producers in Germany, engaged in manufacturing merchandise of the same class or kind. We are quite satisfied with such rate of profit, and believe it to be reasonable and just from every consideration.

The appellate court held that the foregoing quoted portion of the manufacturer's affidavit was evidence sufficiently substantial to sustain a holding by this court that the 15 per centum "profit" added by the importers was "equal to the profit" ordinarily added by manufacturers in Germany of merchandise of the same general character as that under consideration, citing the *Maier* case, *supra*.

In view of the evidence presented and the decisions cited we hold the evidence as to profit sufficient within the provisions of the law. Inasmuch as the type in question was shipped in January 1938, we approve the adoption by the trial court of the average profit for the year 1937 as the profit to be added as an element of the cost of production herein.

The Government contends that the trial court erred in adopting the foregoing cost of production for the additional reason that it was lower than contended for by the importer. The importer contended that the "inland value" represented the cost of production. However, it is noted that in computing the profit from such value the importer failed to note that the "inland prices" were subject to a discount of 25 per centum, which when taken into consideration, would reduce the profit below the percentage adopted by the trial court.

For the reasons stated, judgment will be entered affirming the judgment of the trial court.