## NICHOLAS GAL *v.* UNITED STATES

No. 5948.—Invoices dated Teningen, Germany, April 18, 1936, etc.
      Certified April 22, 1936, etc.
      Entered at New York, N. Y., May 5, 1936, etc.
      Entry No. 835955, etc.

(Decided November 1, 1943)

*Eugene R. Pickrell* for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

TILSON, Judge: The 7 appeals listed in schedule A, hereto attached and made a part hereof, involve the proper dutiable value of 13 different kinds of aluminum foil exported from Germany and entered at the port of New York between May 5, 1936, and November 7, 1936. The merchandise was appraised on the basis of foreign value. The plaintiff claims that there is no foreign value for the merchandise and that it should be appraised on the basis of export value.

The claim of the plaintiff that there was no foreign value for this merchandise is based upon the contention that no such or similar merchandise was sold or freely offered for sale to all purchasers in the ordinary course of trade in the principal market for home consumption in Germany.

There is evidence before me which is sufficient to show that the aluminum foil which was sold in Germany for home consumption during the period covered by these appeals was not such as or similar to the aluminum foil here in question and this is sufficient upon which to base a finding that there was no foreign value for the imported merchandise. But there is undisputed evidence in the record before me to the effect that the home market in Germany for all aluminum foil was restricted. I quote from plaintiffs' exhibit 5:

That the condition imposed upon the manufacturers of aluminum foils to the effect that they may sell aluminum foils only under the condition that the purchasers themselves use the merchandise and do not resell same, is contained in item 2 of the attached printed "Delivery Conditions" which item reads as follows:
2. Customers are forbidden to resell the foils.

Upon each of the invoices covering aluminum foil for sale in Germany appeared the following:

This foil is delivered to you only for your own consumption and may not be resold.

It further appears that anyone who violated the edict against resale of aluminum foil was penalized by being excluded from further deliveries of aluminum foil.

It also appears from plaintiff's exhibit 9 that during the period covered by these appeals the German "cartels had lists of individuals, partnerships, corporations, and other concerns to whom the members of these cartels could only sell aluminum foil and aluminum metal covered paper -to, for home consumption in Germany"; that "the members of these cartels were prohibited from selling to individuals, partnerships, corporations, or other concerns, who were not on the lists," and that these lists "did not include all of the possible purchasers of these commodities." " * * * these cartels penalized their members for violation of any of the restrictions * * * by assessing a penalty or fine of 1 reichsmark per kilogram of the merchandise so sold without restriction, for each violation."

Based upon the evidence in this case, and following the decisions of our appellate court in *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, and *Cottman* v. *United States*, 20 C. C. P. A. 344, I find and hold that no foreign value existed for the involved aluminum foil during the dates of exportation thereof.

Although the importations herein occurred prior to the enactment of the Customs Administrative Act of 1938, sales and offers for sale of such or similar merchandise to countries other than the United States cannot be considered in an effort to find foreign value for the reason that affiant in plaintiff's exhibit 4 states that no such offers or sales existed during the export period here involved.

I come now to the question of whether or not the plaintiff has established an export value for the instant aluminum foil. During the export period here involved Nicholas Gal, the plaintiff herein, had with the exporter an exclusive representation agreement for the sale of all the exporter's products throughout the entire United States. According to the terms of this agreement the exporter agreed to make all sales in the United States through its agent, Nicholas Gal, and to turn over for the attention of Nicholas Gal any business which may possibly result from inquiries from export circles.

According to the record every sale of the exporter's merchandise in the United States had to pass through the hands of Nicholas Gal. On the other hand Nicholas Gal offered for sale and sold said merchandise to any person in the United States who wished to buy the same. There was no restriction as to who could buy, and no restrictions as to what they did with the merchandise after they had pur-

chased the same. All offers for sale and all sales were free offers for sale and free sales. All orders for the merchandise taken by Nicholas Gal had to be forwarded to the exporter for acceptance or rejection. After such orders had been acted upon by the exporter Nicholas Gal was notified of the action taken, and he in turn notified the party placing the order of the action taken by the exporter. Nicholas Gal had no authority to accept or reject the order for the merchandise. In this connection Nicholas Gal testified as follows:

* * *. Of course, I made first a survey to find out who is using that type of foil which we are manufacturing, and then I offered the foil either by personal calls, or letters, or telephone, any way I found it possible to do, and I offered it according to the price of the price list which I had on hand; and then the price was either accepted or not. If it was not, then I tried to get another price for it which I thought would be acceptable. Through many negotiations the business either materialized or did not materialize. When it materialized, I received an order which was, of course, understood that it was subject to acceptance by the factory. So, the usual practice was that I cabled over that such an order was received and when it was accepted and the cable came in indicating acceptance or refusal, according to that I considered the deal closed or not closed. That was in great part the way it was done. Then the merchandise was, of course, delivered. When it arrived here I gave instructions to Globe Shipping Co., who was my customs broker, where to deliver it. It was invoiced and then payment made, and that was the end of the transaction.

During the export period involved Nicholas Gal had no interest in the merchandise, other than that of sales representative of the exporter, and for his services as such sales agent he was to receive a commission of 6 per centum. The exporter was responsible for the credit of the party to whom it sold the aluminum foil. In several instances the customer became insolvent and refused to pay, and in such cases the exporter assumed all financial responsibility, and in case of financial loss this was borne by the exporter.

The relationship between the exporter herein and Nicholas Gal was clearly that of principal and agent. Under a somewhat similar situation in the case of *United States* v. *Gerlach*, Reap. Dec. 5443, the appellate division of this court observed:

* * *. Before making a sale, the agent always cabled the manufacturer for current prices, and, after the order was forwarded to the manufacturer, an acknowledgment directed to the customer was sent to the agent for transmission to the customer and the sale was then complete. *Under such circumstances, the sales by the agent must be considered as sales by the principal.* This is not a case where the manufacturer restricted his sales to one American customer * * *. [Italics mine.]

In the case of *International Bldg., etc., Assoc.* v. *Watson*, 158 Ind. 508, the term agent is defined as follows:

One who is either expressly or impliedly invested with authority from his principal to act in his place and in his behalf.

In the case of *Portland First Nat. Bank* v. *Linn County Bank*, 30 Or. 296, 47 p. 614, in referring to an agent, the court, among other things, said:

Whatever he does lawfully in a transaction of that business is the act of the principal.

2 Corpus Juris, 560, section 202, contains the following statement:

* * *. Ordinarily a third person cannot hold the principal if the agent acted without authority, or outside the scope of the authority really or apparently possessed by such agent. Conversely a party dealing with an agent who is acting within the scope of his authority is regarded as dealing with the principal, and all acts so performed by the agent are binding upon his principal; * * *.

In *Nicklisson* v. *Holman*, 17 Kan. 22, it was held:

In law what is done by an agent within the scope of his agency is done by the principal.

On page 573 of 2 Corpus Juris it is also stated:

* * *. For the acts of his agent within his express authority the principal is liable, because the act of the agent is the act of the principal.

Under the above authorities, therefore, it would appear that the act of Nicholas Gal in taking the orders for the aluminum foil in this case was the act of the principal, the manufacturer in Germany, who accepted or rejected such orders when received by him. Section 402 (d) of the act of 1930 does not require that in order to have an export value, the merchandise must be freely offered for sale to all purchasers by the manufacturer in person and by none other. The phrase in question reads as follows: "* * * at which such or similar merchandise is freely offered for sale to all purchasers * * *." The conditions of the sale of the instant merchandise come squarely within the provisions of the law above quoted, and no reason appears to me why said sales should not be considered sufficient to establish export value.

However, it is not necessary for me to base my finding of an export value entirely upon the sales of the merchandise in this case, made under the conditions hereinbefore set out, for the reason that in plaintiff's exhibit 4 appears the following:

That the prices for aluminum foils of the same quality as or of a quality similar to that comprised within the list appearing in item 4 during the period from January 1, 1935, until the day of the signing of this affidavit offered by plants other than Aluminiumwerk Tscheulin, G. m. b. H., without restriction to the U. S. A., were in general not higher than the prices mentioned in item 6;

The record also shows that Teningen, Germany, was the principal market for the sale of such or similar merchandise to that here involved during the export period herein, and that the usual wholesale quantity is well within the quantities shown on the respective invoices covered by these appeals. Moreover since the record shows

that the prices did not vary according to the quantity purchased, it is unnecessary for me to find a definite usual wholesale quantity.

The facts in this case readily distinguish it from the case of *United States* v. *Shallus*, T. D. 45370. In the instant case the selling agent never owned or had any financial interest in the imported merchandise at any time, and while the selling agent undertook to, and in most instances did, collect the purchase price from the purchaser and transmitted the same, after making certain authorized deduction, to the manufacturer, any amount of any purchase price which the selling agent could not collect was the loss of the manufacturer and not of the selling agent.

The situation in the *Shallus* case, *supra*, was entirely different, as shown by the following:

\* \* \*. Upon its acceptance and shipment it would cable the American company requiring them to at once deposit in the designated bank 60 per centum of the contract price.

\* \* \* \* \* \* \*

The Lagerloef company was something more than a mere agent. While they did not have a stock on hand from which to fill orders pending receipt of merchandise from the association, yet they became responsible for the bill the moment it was shipped. In a strict construction they may be considered the owners of that merchandise, because responsibility carries with it something more than mere agency. It carries with it ownership. The only way they could escape the financial responsibility therefor would be if the merchandise in quality was not acceptable to the consumer, but if the consumer accepted the merchandise received, the Lagerloef company became the owners, responsible to the Finnish Association. Therefore, we can not believe that these facts created an export market in Finland.

\* \* \* \* \* \* \*

\* \* \*. The ownership of the merchandise in question did not remain in the shipper. When it was placed on the vessel ready for shipment to the United States it became the property of the Lagerloef company, because its responsibility instantly attached, and whether the ultimate consignee of the merchandise in the United States paid for it or not, the Lagerloef company was responsible therefor.

In the instant case the selling agent was never required to deposit in any designated bank to the credit of the manufacturer in Germany any percentage of the purchase price of the merchandise, or to in any other manner secure the payment thereof.

There being no foreign value for the imported aluminum foil, and having found that there was an export value for the same, the weight of the evidence clearly shows that the export value is represented by the entered value in each case. After a full consideration of the entire record I, therefore, find and hold the proper dutiable export value of the aluminum foil covered by these appeals to be the entered value. Judgment will be rendered accordingly.