M. V. Jenkins et al. *v.* United States (No. 4517)[1]

---

[1] C. A. D. 341.

United States Court of Customs and Patent Appeals, June 27, 1946

*Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel) for appellants.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

[Oral argument April 2, 1946, by Mr. George R. Tuttle and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, sustaining the action of the trial court which reappraised and increased the dutiable values of certain items of burnt clay products imported by appellants from Vancouver, B. C., and entered at the subports of Sumas and Blaine in the State of Washington between December 29, 1939, and April 21, 1941.

The controversy arose through the action of the Collector of Customs at Seattle in filing a series of 12 appeals for reappraisement on a variety of the imported wares. The collector claimed that the dutiable values of the merchandise were higher than those at which they had been entered and appraised.

When the respective appeals were brought to trial they were all consolidated into one action the subject of which was confined to the imported firebrick product. The judgment of the trial court sustained the appeals of the collector, 13 Cust. Ct. 345, Reap. Dec. 6040, and its action in so doing was affirmed by the appellate division, 14 Cust. Ct. 392, Reap. Dec. 6131.

Appellants moved before the appellate division for a reconsideration of its decision and requested that the case be remanded, which motion was denied.

The merchandise was appraised on the basis of foreign value pursuant to subsection (c) of section 402 of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938, 19 U. S. C. § 1402, 1940, which reads—

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

There is no dispute as to the correctness of the basis of appraisement, and the controversy here is limited to the proper amount of the statutory value of the merchandise and whether any foreign value for it was shown to exist.

The elaborate record, so far as pertinent to the question here in issue, shows that the Clayburn Co., Ltd., manufactured firebrick and other earthenware products at its plant in Kilgard, B. C., some 50 miles from the city of Vancouver where the company maintained its office. Kilgard was without railroad connection, and the merchandise was shipped either by truck from Kilgard to Vancouver and elsewhere or by rail from Abbotsford, 5 miles from Kilgard.

All transactions by Clayburn relating to the sale of the merchandise were conducted at its office in Vancouver where the company kept no stocks and made its sales on the basis of delivery at its plant or shipping point, f. o. b. Kilgard or Abbotsford.

The company sold the major portion of its products through dealers in building supplies in the city of Vancouver. Among such dealers was a group of six members known as Evans, Coleman & Evans and Associates. That organization was Clayburn's largest distributor and each member with but one exception was allowed a discount of 10 per centum on the base price of whatever merchandise was purchased from the manufacturer.

There were some 10 or 15 other dealers in the Vancouver area who were allowed various rates of discount. There were also dealers located in the Province of Alberta to whom the manufacturer allowed a base price lower than that allowed to the dealers in British Columbia.

The proof offered by both sides was analyzed by the trial judge in a way that was entirely acceptable to the appellate division which reviewed the evidence and, so far as pertinent, made the following findings of fact:

(4) That the principal market for such merchandise is Vancouver, British Columbia.

(5) That the manufacturer's prices to its dealers are controlled prices and therefore not acceptable as dutiable foreign values.

(6) That the dealers freely offered the products in question for home consumption to all purchasers in wholesale quantities in the said principal market, and therefore their prices are the dutiable foreign values.

Appellants do not dispute that the manufacturer imposed a restriction upon its dealers. That restriction and the manufacturer's sales agreement with its dealers are described in appellants' brief from which we quote, omitting incidental references to pages:

\* \* \* when selling to dealers, Clayburn, as found by the court below, required those dealers, *if they resold upon an f. o. b. Kilgard basis*, not to resell at prices lower than Clayburn's Kilgard price of $57.50 per 1,000 in the case of "squares." However, whenever the dealers hauled the merchandise from Kilgard to their places of business in Victoria, Vancouver, New Westminster, Marpole, or any other place, they were perfectly free to sell it at any price they chose. \* \* \*

The restriction hereinbefore described was the basis for the concurring decisions of the tribunals of the Customs Court in finding that Clayburn did not freely offer the merchandise for sale to all purchasers. Appellants contend, however, that the foregoing conclusion is erroneous—

\* \* \* because *every* "dealer" who was restricted by Clayburn with regard to his sales when made *upon an f. o. b. Kilgard basis*, did purchase from Clayburn and did resell without restriction after he had hauled the merchandise to his place of business. \* \* \*

In determining the question of whether merchandise is freely offered for sale to all purchasers in the principal markets from which exported, this court has held that "The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint." *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, 135, C. A. D. 262.

Numerous cases have been cited here by both parties in support of their contentions but in none of the cited cases is the factual situation on all fours with the facts in the case at bar. This court has pointed out and correctly held, however, "that all the authorities relating to cases in which the prices for resale were fixed by the original sellers were to the effect that a restricted market was created, and that in such cases there was no foreign value in the sense of the statute." *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C. C. P. A. (Customs) 1, 6, C. A. D. 115. See also *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. 351, 354, T. D. 39158; *Meadows, Wye & Co. (Inc.) et al.* v. *United States*, 17 C. C. P. A. (Customs) 36, T. D. 43324.

In support of their position here, for example, both sides cite the decision of this court in *United States* v. *Heemsoth-Kerner Corp.* (*Bauer Type Foundry, Inc.*), 31 C. C. P. A. (Customs) 75, C. A. D. 252. The issue and the decision in that case were succinctly pointed out in the following statement by the court:

So while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors which territories cover a major portion of the United States. Therefore it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402 (e), *supra*.

Appellants contend—

Here the same conditions as to a restricted territory existed. Consequently, the court below erred in holding that the prices at which Evans & Associates offered these products to buyers located *only* in British Columbia represented "foreign" value.

The difficulty with appellants' position is that the record fails to establish that Evans & Associates were actually restricted to selling the merchandise only in British Columbia. The contract submitted as an exhibit does not establish that the sales activity of Evans & Associates were restricted solely to British Columbia or that they were not permitted to sell elsewhere in Canada. Moreover, the testimony and other evidence cited by appellants are likewise insufficient to sustain their position on the point in question. On the other hand, there is substantial evidence in the record to support the finding of the court that Evans & Associates in making sales of the merchandise were not restricted to British Columbia.

In view of appellants' restriction as to the resale of the merchandise by dealers at Kilgard, however, it is our opinion that the Government's position is well taken with reference to the application of the doctrine of the *Heemsoth-Kerner* case, *supra*. As stated in the Government's brief—

* * * This restriction, though applying only to some sales, was sufficient to eliminate such list prices as the basis for establishing a statutory United States value. By analogy, a restriction which controls the resale price in Kilgard but not elsewhere is sufficient to eliminate, as statutory foreign value, the unit prices at which sales were consummated coupled with such restriction.

Based upon substantial evidence in the record, the appellate division correctly found also that the principal market for the merchandise was at Vancouver; that no control was exercised there in the sale of the merchandise; and that the dealers freely offered it for sale in that market to all purchasers in the usual wholesale quantities for home consumption and in the ordinary course of trade.

Appellants contend, however, that the market created by

Clayburn's sales was at Kilgard, that it was a principal market, and that the foreign value of the merchandise must be measured by Clayburn's uniform price to dealers there of $57.50 per 1,000 squares. The appellate division properly overruled that contention. Under the statute, foreign value is to be determined not by the place at which the merchandise is delivered in the fulfillment of a contract of sale, but at the place where the merchandise is freely offered for sale. *United States* v. *T. E. Ash (American Askania Corp.)*; *Freedman & Slater*, 22 C. C. P. A. (Customs) 395, T. D. 47401.

There is substantial evidence in the record to support the finding of the court that the merchandise was not freely offered for sale by the Clayburn Co. for home consumption to all purchasers in the usual wholesale quantities and in the ordinary course of trade either at Kilgard or in any other market of Canada at the time of export of such merchandise to the United States. The price at which Clayburn offered its merchandise was therefore not acceptable as the basis of dutiable foreign value.

Appellants contend further that the dealers in Vancouver did not freely offer the merchandise for sale in the usual wholesale quantities at a uniform price and for that reason the foreign value of the merchandise was improperly reappraised by the appellate division.

With reference to its finding of the usual wholesale quantities, the trial court said, among other things, that, although the witness W. F. Foster, building supply manager of Evans, Coleman & Evans, Ltd., who testified for the Government, stated "that a sale in carload lots would be a wholesale quantity, I am bound by the stipulation of the parties and I hold that the usual wholesale quantities in which the merchandise was bought and sold in Canada at the various dates of exportation of the merchandise herein involved, were as noted in the records of sales in collective exhibits 2, 3, 4, 5, 6 and 8–A, 8–B, 8–C, 8–D, and 8–E as above described."

Although the parties entered into a stipulation as to wholesale quantities, we find no stipulation of record as to the *usual* wholesale quantities in which the involved merchandise was freely offered for sale to all purchasers in the principal market of Canada, which the trial court found to be Vancouver. Furthermore, instead of finding the usual wholesale quantities in which the various articles here involved were freely offered for sale for home consumption to all purchasers in the principal markets of Canada, the trial court stated that the usual wholesale quantities were "as noted in the records of sales in" the collective exhibits hereinbefore referred to.

It appears from the collective exhibits, referred to by the trial court, that neither the quantities in which the merchandise was sold, nor the prices at which it was sold, were uniform.

With regard to such variances, the trial court stated that, although the prices in wholesale quantities of merchandise like that here involved differed, there was authority for holding that "where goods are sold at different prices in wholesale quantities, the highest price is the price at which the goods shall be considered as freely offered for sale to all purchasers." In support of that statement, the court cited the case of *United States* v. *Mexican Products Co.*, 28 C. C. P. A. (Customs) 80, C. A. D. 129. That case is not authority for holding that where prices differ, the highest price shall be the price at which the merchandise is freely offered for sale within the purview of section 402 (c), *supra*.

In the *Mexican Products Co.* case, *supra*, it appeared that the merchandise there in question was freely offered for sale to all purchasers at certain list prices and that all other prices at which it was sold either for home consumption in Mexico or for export to the United States depended upon the bargaining ability of the purchasers, some of whom received discounts from the list prices of goods for consumption in Mexico ranging from 5 per centum to 15 per centum and others received discounts from the list prices of goods to be exported to the United States ranging from 5 per centum to 21 per centum. There being no uniform prices, other than the list prices, at which the merchandise was freely offered for sale, this court held that the dutiable values of the merchandise there involved were the list prices. We, of course, had no intention of holding that where the prices differed, the highest price should be considered the price at which the merchandise was freely offered for sale in the usual whole-sale quantities.

The trial court's finding of usual wholesale quantities was affirmed by the appellate division of the Customs Court without discussion.

Neither the trial court nor the appellate division of the Customs Court actually found the usual wholesale quantities in which each of the various articles here involved was freely offered for sale to all purchasers in the principal markets of Canada for home consumption. Accordingly, this court, which is limited to the consideration of questions of law only, is unable to determine whether there is any substantial evidence of record to support the judgment of the appellate division of the Customs Court.

It is well established that the usual wholesale quantity is determined by the greatest number of sales in wholesale quantities. See *United States* v. *M. Minkus*, 21 C. C. P. A. (Customs) 382, T. D. 46912, and cases therein cited.

We think it proper to say in passing that the record in the case is about as confusing as could be presented to a court in a reappraisement proceeding.

Owing to the fact that there has been no finding of the usual whole-sale quantities and the prices at which the various articles here involved were freely offered for sale in usual quantities for consumption in Canada, we find it necessary to reverse the judgment of the appellate division of the Customs Court and remand the case to it with instructions that it in turn remand the case to the trial court for findings in accordance with law.

For the reasons stated, the judgment is *reversed* and the cause *remanded* for proceedings consistent with the views herein expressed.